## RICHMOND COUNTY *v.* RICHMOND COUNTY REFORMATORY INSTITUTE.

1. This court will not permit a writ of error to be withdrawn at the instance of the plaintiff in error, over objection of its counsel, where it appears that such counsel has a contract in the case for a fee contingent upon its successful conduct by him.
2. A plaintiff who sues a defendant as a corporation is estopped from denying its corporate existence.
3. A county can not maintain a suit to recover funds which it alleges that its county commissioner has turned over to a corporation conducting in the county a reformatory for juvenile offenders, on the

ground that such use was unlawful·and unauthorized, where the allegations of the petition are to the legal ·effect that the county commissioner collected from the taxpayers the money so expended, by taxation illegally levied for the purpose of the establishment and maintenance of the reformatory institution for which it was used, and that the act of the legislature under which this was done did not authorize it for more than one year, and that the act was unconstitutional even if it sought to authorize such taxes and payments for other years.

FEBRUARY 28, 1914.

Equitable petition. Before Judge Hammond. Richmond superior court. November 4, 1912.

The County of Richmond filed its petition against the Richmond County Reformatory Institute, praying for injunction, receiver, accounting, and general relief. A temporary restraining order was granted, and on the date of the hearing the restraining order was dissolved and the petition was dismissed on demurrer; to which orders the plaintiff excepted. The petition makes substantially this case: A local act relative to Richmond County was passed in 1885 (Acts 1884-1885, p. 599) entitled "An act to establish in the County of Richmond, in this· State, a Reformatory Institute, to provide for the· maintenance and conduct of the same, and for other purposes." · The first section of the act names certain persons and their successors in office, who "are hereby made a corporation for the purpose of inaugurating, establishing, and conducting in and for the County of Richmond, in this State, an institute for the employment, instruction, and reformation of juvenile offenders, to be called the Richmond County Reformatory Institute." The act also provides that boys and girls of Richmond county, of 16 years of age or under, convicted in Richmond superior court or Richmond city court "of any offense known to the laws of this State and punishable by imprisonment," or convicted in Richmond city court or the recorder's court of the City of Augusta, living "an idle and dissolute life," being orphans, or having parents who do not "provide suitable employment, or exercise salutary control over such minor," may be sentenced to the reformatory, etc. The act provides that the commissioners shall communicate to the grand jury first in session after the organization of "said board" all facts as to action taken by them in their "corporate capacity," together with "a detailed estimate as to the moneys necessary to carry into execution the provisions of this act," and, "upon receipt of said estimate, the grand jury may in their discretion recom-

mend" an amount of money to be raised and set apart for the reformatory "as other moneys for county purposes are raised," and thereupon the county commissioner shall levy a tax to make such amount.

The petition alleges the following: The act contains no provision authorizing any grand jury, except the one designated above, to recommend a county tax for the benefit of the reformatory, or empowering the county commissioner to levy any tax for that purpose, other than such as might be recommended by that particular grand jury; and the act has never been amended in this or any other particular, save in 1887 (Acts of 1887, p. 832), to authorize the reformatory to bind out minors sentenced to its custody, and in 1904 (Acts 1904, p. 283) to empower the recorder of Augusta to sentence to the reformatory minors convicted by him of violating ordinances of that city. The institute laid before the grand jury next in session after the organization (1886) a detailed estimate such as required, and thereupon that grand jury recommended that "a special tax, not to exceed one thousand dollars in amount" be levied for the purpose of buying the reformatory institute a farm whereupon to establish the reformatory, with a recommendation that the money be paid over to five citizens whom they named as commissioners, and that the title be so taken that "should said commissioners, after a fair trial, not to exceed five years, of this benevolent experiment, declare that they can not make it a success, the farm shall be sold," and the county reimbursed. Thereupon the county commissioner levied and collected the special tax of one thousand dollars in 1886, but did not pay over the same to the commissioners appointed by the grand jury, but disbursed it two years later to the defendant institute itself. Subsequent grand juries from 1887 to 1910 (assuming to do so under the act of 1885) recommended further appropriations for the defendant, to the aggregate amount of $63,800; and the county commissioner levied taxes to make the amount and disbursed the same to the defendant institute. They also levied and collected $2,000 to purchase a sixty-acre farm, which added to the other levies makes a total of $64,800 recommended, levied, collected, and paid over under color of the act of 1885. The institute did not open a reformatory until 1892, having received appropriations amounting to $15,500, and then it opened with seven negro boys as its sole in-

mates. When the institute began operations in 1892 it did so with a plant costing $8,028.51, consisting of the sixty-acre farm, equipped with reformatory buildings, farm stock, and all necessary appurtenances ample for one hundred inmates, and had on hand a cash reserve of $7,471.09, and the crop of 1891, the farm being fertile and producing ample food crops and an average cotton crop of forty bales. If the institute had confined itself to the purpose for which it was created, namely, the reformation of the children committed to its custody, it would have been self-supporting; but instead it was subordinated to an extensive and expensive policy of cotton farming and agricultural experimentation, using the labor of the children as a factor in the execution of such policy. In pursuance of such policy it bought 550 acres of cotton and grazing lands at various times from 1893 to 1910, paying therefor $13,972. On one of these farms it conducted a disastrous cattle speculation; it purchased $5,487.69 worth of cattle, placed them on the 300 acres of land, and expended $3,077.41 in feeding them for market, such speculation resulting in a loss of several thousand dollars. (Other speculations are mentioned in the petition, the transactions resulting in loss.) No girls have ever been admitted to the institute, although the act of 1885 makes the reformation of girls as well as boys its object. The boys were not committed for any heinous offenses, but for minor offenses not involving the element of malice to person or property, etc. The effect of this practice was almost to empty the reformatory. The act of 1904 was passed to amend the act of 1885, so as to empower the recorder of Augusta to commit minors to the reformatory, for violations of the city ordinances, to terms not exceeding three years. After the passage of the act of 1904 the commitments to the institute number 214— from the State courts 62; from the recorder's court 152, or 71 per cent., mostly for such petty matters as "chunking," "loitering," "playing ball in the street," the maximum penalty of three years being usually imposed. Various acts of mismanagement and ultra vires acts are alleged as to the management of the institute, which it is unnecessary to mention. The institute has now in its possession the sixty-acre farm and other lands aggregating 250 acres, of the value of $30,000, and has on hand $6,000 in cash, and about $5,000 in other forms of personalty, all of said realty and personalty representing moneys drawn by the institute from the county

treasury, and being the property of the county. The institute has no property of its own. It refuses to account to the county for the above-mentioned property or any part thereof, claims the same as its own, and is daily wasting it, to the irreparable injury of the petitioner, etc. On February 6, 1912, the county commissioners of Richmond County, desiring to avoid the necessity of levying what they deemed any further extra tax for supplying revenue to meet certain county indebtedness, decided "that steps be taken at once in the name and on behalf of the County of Richmond to recover for said county any moneys heretofore drawn from the county treasury without authority of law, and that the chairman of the board secure legal aid to that end." This case is a result of that action, the counsel so retained "to have a contingent interest in the case."

*Salem Dutcher*, for plaintiff.

*William H. Barrett* and *Archibald Blackshear*, for defendant.

HILL, J. (After stating the foregoing facts.)

1. When this case was called for argument in this court, the plaintiff in error presented a petition to the court from the board of county commissioners of Richmond County, requesting leave to withdraw the writ of error. In the resolution adopted by the county commissioners, requesting the withdrawal of the writ, it was provided "that a reasonable compensation be paid Mr. Salem Dutcher, attorney for the county, for services thus far rendered by him in such suit, provided he acquiesces in such withdrawal." In a letter addressed to the clerk of this court by the attorney of record named in the foregoing resolution, which letter is filed with the request to withdraw, after quoting the language of the above resolution, he says: "Having a contingent fee in that case, in writing recorded on the minutes of the board, I decline to acquiesce; and respectfully notify you of that fact, which declination kindly file at once." This request to withdraw is controlled by the decision in the case of *Walker* v. *Equitable Mortgage Company*, 114 *Ga.* 682 (40 S. E. 1010), where it is held that "A plaintiff in error in this court can not withdraw a writ of error over the objection of his counsel, when it appears that the litigation is such that it would, if successful, result in a recovery of property on which counsel would have a lien for fees earned in the case." The prin-

ciple is the same where it appears that the fee of the attorney is contingent.

2. The plaintiff brought suit against the Richmond County Reformatory Institute, alleging, among other things, that the act of 1885 (Acts 1884-1885, p. 599) "incorporates" the defendant for certain specified purposes such as the "employment, instruction, and reformation of juvenile offenders," etc. The above act is attacked as void, for many reasons alleged in the petition. Without answering each of these attacks, it is sufficient to say that the plaintiff can not bring suit against the corporation as such and attack collaterally its corporate existence. When a corporation is sued by its corporate name, its existence as such is admitted, and it can not be brought into court and made to answer the plaintiff's allegations that it is not and never was a corporation. *Lester* v. *Georgia &c. Ry. Co.*, 90 *Ga.* 802 (2), 804 (17 S. E. 113) ; *Etowah Milling Co.* v. *Crenshaw*, 116 *Ga.* 406 (2), 410 (42 S. E. 709).

3. It was alleged that the funds by means of which the Richmond County Reformatory Institute was established and maintained were derived from levies of taxes by the county officials assuming to act under the authority of the act of 1885 hereinbefore referred to; and it was the property for which these funds had been expended which the plaintiff sought to recover, basing its right thereto on the invalidity of the act in question, and also a construction of it if valid. If funds belonging to a county are illegally paid out by its officials, the county may bring suit to recover them. If from the general funds in the county treasury amounts are illegally paid to a corporation, and suit is brought against it to recover such funds, and nothing more is shown by the plaintiff, the defendant might not be able to keep the money illegally appropriated to it from such general fund, and defend by asserting that the county unlawfully collected a tax from the taxpayers which went into such general fund. The question of whether the tax was illegally collected from the taxpayers would be one between the taxpayers and the county, and would probably not furnish a defense to a corporation to which such appropriations from the general fund had been made. If the taxes were paid directly by the taxpayers to the corporation, or through an agent, so that the amount collected did not become a part of the general funds of the county, and was not appropriated therefrom to the

corporation, the rule above stated would not apply; but the question of the illegality of the tax would arise between the taxpayer and the corporation to which, immediately or through an agent, the tax was paid. But where a county files its proceeding against a corporation having charge of the county reformatory, seeking to recover from it funds paid to it, or the proceeds thereof, and in its petition alleges that such funds arose from illegal taxation, and therefore that the county never had any right or title to such funds, it shows on the face of its own pleading that it is not authorized to recover. It can only recover funds belonging to the county; and if it alleges that the funds used arose from an illegal source and in law never belonged to the county, it destroys its own case. If a county alleges, in legal effect, that the money which was delivered to the corporation arose from illegal taxation, and that it never belonged to the county, in case of a recovery from the corporation what would become of the fund? In *Truett v. Justices &c.,* 20 *Ga.* 102, it was held: "A tax originally assessed and collected, under an order . . , for one purpose, which is illegal and void, can not, for that reason, be directed to another purpose, which is valid." The county not only alleges that it illegally collected the money, but, in seeking to have the act of 1885 declared void, it asks the court to adjudicate, in this proceeding, that it was illegally collected and consequently that it was never county funds. The county sets up that under the act of 1885 it collected from the taxpayers certain sums of money, and that it appropriated and paid the same, or equivalent sums, to the corporation. It attacks at once its right to collect the money and to pay it out to the corporation, both under the construction of the act, and by attacking the validity of the act. If the act should be declared void, it would destroy the authority of the county to collect the money by taxation, as well as the authority of its officials to pay it out to the corporation. If the act were not held to be void, but the contention of the plaintiff, that under a proper construction of it the county was only authorized to collect and pay to the corporation $1,000, and that all other collections of taxes for and payments of amounts to the corporation were entirely void, be sustained, then the same result above indicated would apply as well to all except the original $1,000, and as to that the collection and payment would be legal, or its recovery would be barred if the payment was not properly

made. So that, in any event, the county occupies the position of at once attacking its own title to the funds and seeking to have it declared that it never lawfully had such funds, and at the same time seeking to recover them as funds of the county from the person to whom it, or its commissioner, paid the amounts thus unlawfully raised, or their equivalent, after having raised them expressly for the benefit of such person. The county sets up, in effect, that the corporation for which it collected, and to which it paid the money, has no title or right thereto, because it—the county —had no right to collect it, and therefore had no legal title or right to it. It follows that the action could not be maintained, and a general demurrer thereto was properly sustained. Other contentions need not be discussed.

*Judgment affirmed. All the Justices concur, except Evans, P. J., absent.*