JAMES ARGEROPOULOS, Respondent, v. THE KANSAS CITY RAILWAYS COMPANY, Appellant.

Kansas City Court of Appeals, February 17, 1919.

1. NEGLIGENCE: Assignment of Judgment: Dismissal of Cause. In an action for negligence the plaintiff secured a judgment which he later assigned. *Held*, that after such assignment the plaintiff was not at liberty to dismiss his cause of action and defeat the rights of the assignee.

2. ———: ———: ———: Validity. Though the failure of the clerk of the court to attest the assignment of a judgment, as prescribed by Section 2156, Revised Statutes 1909, may prevent the vesting of an absolute and legal title in the assignee, the assignor after the cause of action has merged in the judgment may not subsequently dismiss the cause of action and defeat the rights of the assignee.

3. ———: Evidence: Question for Jury. Where the defendant's motorman testified that he had sounded a warning and the plaintiff testified that he heard no warning the latter's evidence was more than negative and the truth of the evidence became a question for the jury.

4. ———: Instructions: Assumption of Undisputed Fact. Where there is no dispute in the evidence that plaintiff was on the track all the time in question, an instruction which assumes that fact is not erroneous.

5. ———: Contributory Negligence: Failure to Plead. Where no charge of contributory negligence is pleaded and none appears in plaintiff's evidence, it is not error to refuse to submit such issue to the jury.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Ju·lge.

AFFIRMED.

*Kimbrell & O'Donnell* for respondent.

*Clyde Taylor* and *Roscoe P. Conkling* for.appellant.

On Appellant's Motion to set aside submission and dismiss Respondent's cause of action.

TRIMBLE, J.—The original cause of action involved in the appeal herein was tried in the circuit court of Jackson county, Missouri, and a judgment was rendered in favor of the plaintiff James Argeropolous, on November 23, 1916. His attorneys were Kimbrell & O'Donnell, a firm composed of I. B. Kimbrell and Martin J. O'Donnell. A motion for new trial was filed by defendant November 27, 1916. At the January, 1917, term of said court, this motion was overruled and an appeal allowed to the appellate court.

On April 3, 1918, the cause·in our court was submitted on briefs. On May 20, 1918, an opinion by BLAND, J. was handed down reversing and remanding the cause. On May 29, 1918, respondent filed a motion for rehearing which was sustained July 1, 1918. All of the foregoing was at the March, 1918, term of this court.

At the October term, and on October 16, 1918, the appeal was orally argued and submitted by appellant and respondent, acting through and by their attorneys.

After the opinion on the case under the last submission had been prepared and was ready for delivery at the sitting for announcement of opinions on January 6, 1919, but before it was announced, the appellant, on January 2, 1919, filed a document reading as follows:

"In the Kansas City Court of Appeals
at Kansas City, Missouri.
March Term, 1918.

ROBERT J. DUNHAM and FORD F. HARVEY, Receivers of
the METROPOLITAN STREET RAILWAY COMPANY, Appellant.

v.

No.——

JAMES ARGEROPOULOS, Respondent.
*Stipulation of Dismissal.*

I, James Argeroupolso, the above named respond-, ent, hereby dismiss the above entitled cause with prejudice against the institution· of further proceedings herein, and personally authorize and direct any attorney-at-law to appear for me and have the order of dismissal made of record; and the above court is requested and directed to dismiss said cause with or without the appearance of an attorney; the unpaid costs to be paid by the above named appellants.

JAMES ARGEROPOULOS,
Respondent.

Gust West."

It will be observed that this paper is not dated, but in the caption it gives the term of court in .which it is apparently to be used as the *"March Term, 1918."*

On January 9, 1918, Kimbrell & O'Donnell, acting as attorneys for respondent, filed an application in his behalf to be permitted to withdraw the document purporting to be a· dismissal, because it was not the act of respondent. And Martin J. O'Donnell, one of said firm of attorneys, acting for himself, and I. B. Kimbrell the other member of said firm, acting as attorney for said O'Donnell, filed a motion to have the court strike out said document entitled "Stipulation for Dismissal" and to proceed to dispose of the case regardless of, and without giving effect to, alleged dismissal. The grounds of this motion were that on November 25, 1916, Martin J. O'Donnell became the assignee for value of the judgment appealed from, which assignment was placed

201 M. A.—19

on the margin of the record of said judgment on said November 25, 1916; that appellant had notice of said assignment prior to the March, 1918, term of this court, at which term the so-called stipulation purports to have been executed; and that by virtue of said assignment all of the right, title and interest of plaintiff and respondent, James Argeropoulos, in and to said judgment became vested in the said assignee Martin J. O'Donnell.

On January 17, 1919, appellant filed a motion to set aside submission of the cause and to enter an order dismissing plaintiff's cause of action. This motion is based on the hereinabove quoted "Stipulation for Dismissal" and upon facts alleged to be as follows: That on May 23, 1918, three days after the cause had been ordered reversed and remanded by the opinion handed down on May 20th, plaintiff settled his cause of action and accepted $315 in full settlement and discharge thereof; that at said time plaintiff executed the dismissal of his cause of action in this court hereinabove quoted, but "through inadvertence and oversight . . . the same was not filed in this court until recently."

Affidavits and other evidence were prepared and filed with this court bearing upon the respective sides of the controversy, and suggestions in support thereof, and the matter is now before us for consideration.

On the margin of the record of the judgment appears the following:

"For value received I hereby assign all my right and title to the within judgment to Martin J. O'Donnell.

JAMES ARGEROPOULOS,"

Attest:————
                    Clerk.

In the Circuit Court of Jackson County, Missouri,
              At Kansas City, 1916.

JAMES ARGEROPOULOS, Plaintiff,

        v.                        No. 101283.

FORD F. HARVEY, R. J. DUNHAM, Receivers of METROPOLITAN STREET RAILWAY COMPANY, and KANSAS CITY RAILWAYS COMPANY, Defendants.

Assignment of Judgment.

On this 25th day of November, 1916, I, James Argeropoulos, for value received hereby assign all my right, title and interest in and to the judgment rendered in my behalf in Division No. 2 of the above court on the 24th day of November, 1916, to Martin J. O'Donnell.

JAMES ARGEROPOULOS.

STATE OF MISSOURI,  ⎫
                    ⎬ ss.
COUNTY OF JACKSON.  ⎭

On this the 25th day of November, 1916, before me personally appeared James Argeropoulos, to me personally known to be the person whose name is signed to and who is mentioned in the above instrument; and the said James Argeropoulos, having first read the same and being familiar with its contents, did acknowledge the same as his free act and deed.

(Seal) PEARL M. CRAIG,
Notary Public."

Appellant's evidence is to the effect that James Argeropoulos, the plaintiff and respondent in this cause, came to the office of appellant's legal department on May 23, 1918, with a companion by the name of Gust West; and there agreed to take, and did take, $315 in full settlement of his cause of action, and was paid that amount and executed a release thereof and signed the hereinabove quoted dismissal. Also that Argeropoulos came to Kansas City shortly before May 23, 1918, and, not being satisfied with the progress of his case and wanting no further delay in getting some money in the matter, requested Gust West to get in touch with the Legal Department of the Street Railway Company and effect a settlement; that the latter took said Argeropoulos, or accompanied him to said Department where the case was settled and the money paid and Argeropoulos left Kansas City that evening,

May 23, 1918. Sworn copies of the Release, Voucher and Check executed in settlement of the case were filed; all of these are dated May 23, 1918.

Appellant, relying on section 1979 and 1980, Revised Statutes 1909, says that a plaintiff has the right at any time and at any stage of the proceedings to dismiss his cause of action except in those instances where the defendant's rights would be prejudiced. The former section provides that a plaintiff in any court of record may dismiss his suit in vacation upon the payment of all costs therein; and the latter provides that a plaintiff shall be allowed to dismiss his suit or take a nonsuit at any time before the same is finally submitted to the jury or to the court sitting as a jury, or to the court, and not afterward. There is no question but that, in the absence of fraud in its various forms or unlawful consideration, settlements tending to avoid litigation are not contrary to public policy. [Brandenburger v. Puller, 266 Mo. 534.] Indeed, they are looked upon with favor by the courts. It is also true that a nonsuit may be taken after reversal and remand for a new trial under a statute allowing a nonsuit at any time before trial as the cause then stands for trial *de novo*. [14 Cyc. 406.] But in the case at bar there was no reversal of the judgment nor remand of the cause, only an opinion to that effect which never ripened into a judgment but which was superseded by the sustention of a motion for rehearing and the argument and submission on such rehearing. The motion herein considered is a motion to dismiss the *cause of action*, not the appeal. But the cause of action has been merged in the judgment. [Lewis v. St. Louis, etc., R. Co., 59 Mo. 495, 503; Moorman v. Wood, 117 Ind. 144.] The handing down of the opinion on May 20th, did not affect the judgment below. That could only be affected by our judgment and the filing of a mandate based thereon. [State ex rel. v. Broaddus, 234 Mo. 358.]

If we give effect to the assignment of the judgment to O'Donnell, then he is the assignee thereof "for

value." And whether the consideration therefor be for a pecuniary consideration or solely for the services rendered, yet, either is good, since under section 964 and 965, Revised Statutes 1909, the latter is a property right in the attorney, being the lien upon the plaintiff's cause of action which attaches to the judgment and "cannot be affected by any settlement between the parties before or after judgment." Said statutes vest a property right in the attorney rendering the services in the case. [Wait v. Atchison, etc., R. Co., 204 Mo. 491; O'Connor v. St. Louis Transit Co., 198 Mo. 622; Taylor v. St. Louis Transit Co., 198 Mo. 715.] Under such statutes giving an attorney a lien, it is held that he has a property right in the judgment or such interest therein as entitles him to oppose a motion to dismiss; and where it appears that the litigation is such that it would, if successful, result in a judgment on which counsel would have a lien for fees earned in the case, the plaintiff cannot, over the attorneys objection, withdraw the appeal or writ of error. [Walker v. Equitable Mortgage Co., 114 Ga. 862; Kimbrough v. Pitts, 63 Ga. 496; Richmond County v. Richmond County Reformatory Institute, 141 Ga. 457.] It would seem that this would apply with much more force where the plaintiff in attempting to withdraw, not his appeal, but to obliterate his *cause of action* after it has become merged into a judgment and the rights of his attorneys have clearly attached.

The assignment of the judgment, if it is to be given the effect of an assignment, is to a member of the firm of attorneys entitled to a lien; and said firm is not objecting to the assignment but is satisfied therewith. Treating the assignment as valid, it transfers the judgment to the assignee and carries with it all incidental rights, remedies and advantages existing at the time of the assignment · and then available to the judgment creditor. [Applegate v. Mason, 13 Ind. 75; Reed v. Lozier, 48 Hun. 50; Richmond, etc., Assn. v. Richmond, etc., Assn., 100 Pa. St. 1191.] Of course, the assignment is subject to the reversal of the judgment on ap-

peal if that contingency arose. The effect of a valid assignment of a judgment is to divest the assignor of all interest in it and all control over it. [Howard v. Graybehl, 63 Pac. 953.] And the assignor is powerless to interfere with the proceedings by which the judgment is sought to be affected. [Ford v. Rosenthal, 11 S. W. 904.] The assignor can take no action with reference to the original liability, which is merged in the judgment, so as to affect the rights of the assignee or any other party. [Moorman v. Wood, supra.] Nor can the *judgment debtor* question the validity of the assignment, unless the assignment was taken for his benefit or paid for with funds advanced by him for that purpose. [Bender v. Matney, 122 Mo. 244, 255.]

But appellant says the assignment cannot be regarded as valid, since it was not attested by the Clerk. It seems that for some reason the clerk refused to attest the signature to the assignment, whereupon the parties thereto had it acknowledged before a notary and that was attached to the record. Section 2156, Revised Statutes 1909, provides that judgment of courts of records may be assigned in writing by the plaintiff, which assignment shall be on or attached to the judgment and attested by the clerk of the court and, when so made and attested, shall vest the title to such judgment in the assignee. Whether the attestation of the clerk is mandatory or merely directory we need not attempt to say. For whether the assignment be sufficient to vest the absolute and perfect legal title to the judgment in O'Donnell, clearly the plaintiff could not, after judgment was rendered and the rights of his attorneys had intervened and attached to it, dismiss the cause of action which had become merged in the judgment, and thus compel the attorneys to begin over anew in their effort to enforce their lien. The assignment, even if not conforming to the requirements of a statutory assignment, nevertheless gives the assignee such rights as ought to entitle him to have the sufficiency of the judgment finally determined upon the appeal, especially

where appellant joined in the submission thereof long after it now claims the cause of action was settled.

The motion to set aside the submission and dismiss the case will therefore be overruled. It is so ordered. All concur.

## OPINION.

TRIMBLE, J.—While going south on Grand Avenue in Kansas City, Missouri, riding in a one-horse open express wagon, plaintiff was thrown therefrom and severely injured by a south bound street car overtaking and striking said wagon. He brought this suit for damages. Two specifications of negligence were alleged: First, that the operatives of the car ran it against the wagon notwithstanding they saw or by ordinary care could have seen plaintiff on the track, in a position of peril and unconscious of the car's approach, in time, by the exercise of ordinary care, to have avoided injuring plaintiff, either by stopping said car, slacking its speed, or warning plaintiff of its approach, which said operatives negligently failed to do; second, that although said operatives were running a street car on a public highway and knew or by ordinary care could have known of the presence of plaintiff and the wagon and that said highway was constantly used by the public traveling theron, yet they negligently failed to maintain a reasonable lookout for plaintiff and the general public, and, as a direct result of said negligence, ran the car against the wagon and injured plaintiff. The answer was a general denial. Upon a trial, plaintiff obtained a verdict and judgment and the defendant appealed.

Plaintiff was not driving, nor did he have any control over, the wagon. He had hired the owner thereof to haul him and his trunk to the union station. The driver and plaintiff, with his cousin, were seated with their faces in the direction the wagon was going. At a point about fifty feet south of 20th street, the space immediately in front of them was obstructed by an automobile becoming stalled in their path, and, in

order to go around the automobile, the driver of the wagon drove upon the south bound or west street car track, and, with the left wheels of the wagon slightly over the first rail of said track, proceeded southward thereon for about one hundred feet, the horse moving in a walk. At this point a south bound street car going at the rate of twenty miles per hour came up from behind and, without warning or signal, struck the wagon and threw plaintiff out.

At the time the wagon started to go upon the track both the driver and plaintiff looked back but saw no car approaching. They were at that moment prevented from seeing any further north than 19th street (a little over a block away), by reason of the passing of a car from west to east on 19th street across Grand Avenue. It was after nightfall, being sometime between 6:30 and 7:30 o'clock p. m. in February. The night was dry but there was snow on the ground. The street was well lighted by clusters of electric lights located at intervals of about fifty or sixty feet on both sides of the avenue and by a large electric sign on a huge building nearby. A moment before the collision the occupants of the wagon heard the rumble of the approaching car but it was then too late to escape though an attempt was made to do so. The car pushed the wagon along the track for about fifteen feet and thereafter ran some forty or forty-five feet before it was stopped. The motorman testified that when the car struck the wagon the plaintiff fell out into the street; and the conductor says that after the collision he went to plaintiff who was lying face downward upon the pavement. The conductor turned him over and found he was unconscious and with blood oozing from his left ear. He and the motorman carried plaintiff to the curb and laid him down on the sidewalk. Plaintiff's evidence is that the wagon had a red light tied to its rear.

The car was on its way to the barn at the close of its day's run; and the motorman admitted he was in a hurry to get there and that he was going at least twenty miles per hour. He testified that owing to the

location of the lights on the street at that time he
could not see an object further than seventy-five feet
away; that going at twenty miles per hour he could
stop in seventy-five feet but that this would depend on
the condition of the rail, and that on this occasion the
car was stopped in "about seventy-five feet." He said
that when he first saw the wagon it was "about seventy-
five feet" away, the wagon "quartering to the south-
west," the front (left) wheel about the middle of the
track and the horse just outside the outside rail, that is,
the right hand or west rail on the south bound track. By
his own testimony, therefore, upon its most favorable
interpretation to him, he saw the wagon when it was
seventy-five feet away and though he could stop in that
distance yet he did not prevent the collision. He also
said the wagon was 200 feet south of 20th street which
tends to show that the wagon traveled for more than
100 feet on the street car track. But, notwithstanding
the motorman's evidence that he could see only seventy-
five feet ahead of him, there was ample evidence tend-
ing to show that the wagon could have been seen from
19th street; there was nothing to obstruct the vision that
far back; and one of defendant's own witnesses,
Arnold, who was in an automobile going south on
Grand Avenue the same way the car was going, says
he saw the wagon when it was *150 feet away.* Hence,
according to defendant's testimony, the wagon could
have been seen by the motorman for a distance of
seventy-five feet before he did see it. For what Arnold
saw could have been seen by the motorman. [Moore v.
United Railways, 170 S. W. 386, 388.] It will not do here
to say that during this first seventy-five feet the wagon
was not on the track nor in danger, because all the
evidence in the case is that the wagon at a point fifty
feet south of 20th street turned upon the track and
went thereon for 100 feet before it was struck. During
all this time and down to and including the moment the
motorman finally saw the wagon, when it was only
seventy-five feet away, it was in a perilous situation,
not *crossing* the track but proceeding *along* it with the

left wheels in the middle of the track and the horse just outside the rail. If the wagon was "quartering to the southwest" as the motorman says it was when he first saw it, this merely shows that the wagon was leisurely proceeding to gradually get back into the path from which it had veered to get around the stalled automobile, and hence the motorman's testimony is not contradictory of but is consistent with the plaintiff's evidence. There is no testimony whatever anywhere in the case that the wagon was ever east of the track, that is, on the left side of the street and was *crossing* the track. Clearly, therefore, in view of the relative speeds at which the wagon and car were concededly going, the wagon was in a perilous situation before and at the moment the car was 150 feet away from the wagon when the motorman, even under defendant's evidence, could have seen it had he looked. And that perilous situation continued until the wagon was struck. Thus it appears that the motorman was negligent for at least a distance of seventy-five feet before he reached a point seventy-five feet from the wagon, and that too without regard to any negligence in running a car twenty miles an hour down a much traveled city thoroughfare where he could only see seventy-five feet ahead of him and where he would require seventy-five feet in which to stop. It was in evidence that after a person is seen on the track it requires a certain or appreciable length of time for the application of the stopping apparatus and for the exertion of its power. Consequently a traveler on the track unaware of the car's approach had no chance of escape even if the motorman did, after seeing him seventy-five feet away, endeavor to stop. Plaintiff had an equal right with the defendant to use the street, and there is no charge of contributory negligence in the case. In other words, *even under defendant's evidence* the jury could well find that the motorman did not see the wagon until it was only seventy-five feet away which did not afford sufficient time to save plaintiff from injury, and that the reason the motorman did not see the wagon sooner was

because he failed to keep a reasonable lookout. Hence there was, in reality, no question of the motorman's negligence nor could there be any issue in regard thereto save only with reference to the efforts he made to avoid the collision, *after* he did see the wagon, by slackening the speed of the car or by warning the plaintiff of his approach. But it is manifest that, in view of his negligence up to the moment he actually saw the wagon on the track, his subsequent effort to avoid the collision by slackening the speed of the car could not neutralize or rectify such negligence unless by such subsequent effort he succeeded in avoiding the collision. This of course he did not do. There is no evidence anywhere in the case that the motorman thought, or had any reason to believe, the wagon would get out of danger before the car would reach it. So far as appearances went, and so far as the fact actually was, the occupants of the wagon were unconscious of the car's approach. Consequently in view of the motorman's negligence up to the time he actually saw the wagon on the track his alleged effort in slackening the car would not relieve defendant of liability nor destroy plaintiff's case. Even if warnings were given, as the motorman claims, yet if not given *in time* to enable the wagon to get out of danger, the plaintiff is entitled to recover; and, under such circumstances, no slackening of the car, short of one that would avoid the collision, could exonerate the defendant.

With the case and the evidence as depicted in the foregoing, we are unable to see wherein the plaintiff's instructions 1 and 2 contain reversible error. Said instruction No. 1 told the jury that if plaintiff was going south on Grand Avenue in a wagon on the track in a position of peril and unconscious thereof, and that if the motorman saw or, by ordinary care could have seen, plaintiff in a position of peril and unconscious of the car's approach, in time, by ordinary care, to have avoided the injury "either by stopping said car or by slackening its speed or by warning plaintiff of its approach" and that the motorman negligently failed

to do so, and, as a direct result of such negligent failure, said car ran against and injured plaintiff, then the verdict should be for plaintiff. The criticisms of defendant are directed to the portion of said instruction enclosed in the above quotation marks. The first criticism is that plaintiff had no evidence to show the speed of the car was not slackened, while defendant's evidence showed that, in the attempt to stop, the car was slackened before it struck the wagon. Of course it was slackened in the attempt to stop, but was it slackened *in time* to avoid a collision and did the motorman attempt to stop *in time* to enable the plaintiff to escape? The motorman says the moment he saw the wagon seventy-five feet away he rang his gong *and applied the emergency brake.* This shows that at the instant he first saw the wagon he realized plaintiff's danger and the necessity of *stopping* and yet he did not succeed in stopping nor was there time to do so after he actually saw the wagon. But this was, under defendant's own evidence, long after he *could have seen* the wagon had he exercised ordinary care. It may be true that, after the motorman saw the wagon, no slackening of speed, short of actual stoppage, would avert the collision, but this does not show that, had he seen the wagon when he should have seen it, a slackening of speed then would not have averted or assisted in averting the injury. It is not seen, therefore, why the said instruction No. 1 should be held faulty because it included the element of slackening the speed. The instruction merely gave that as one of the ways of preventing the injury if the motorman had time, in the exercise of ordinary care, to do so. However, even if the instruction be faulty in this regard, we find that defendant in its instruction No. 1 also included the element of slackening the speed, so that the error, if there be any, was joined in by the defendant. The next criticism is that plaintiff's evidence as to the failure to ring the gong or warn plaintiff was merely negative, i. e. that they (the occupants of the wagon) merely say they did not hear any gong, while defendant's evidence

is positive that the bell was rung. We do not regard the plaintiff's evidence as purely negative. It is more than that the witnesses did not hear any gong. They testified positively that no warning was given. When the wagon had gone about half of the 100 feet or more it traveled on the track, a north bound car passed on its track. No one testified that this north bound car sounded its gong or that the noise of said car prevented or in anyway interfered with the men in the wagon hearing the gong of the south bound car if it had been sounded. The fact that just before the wagon was struck the men heard the rumble of the approaching south bound car and tried ineffectually to escape, is some evidence that had the gong been rung they would have heard it since they were not utterly oblivious to sound from that direction. The snow on the ground no doubt tended to deaden the ordinary noise of the street traffic, so that the sound of a gong sharply rung could have been more easily heard than otherwise. Under the circumstances we cannot say that plaintiff's evidence that no warnings were given is of such a purely negative character as to be of no probative force in the presence of the positive testimony of the motorman and one other of defendant's witnesses that they were given. It is true that sometimes positive evidence of witnesses, who concededly are in a position to know, to the effect that a warning was given, will prevail over evidence of witnesses, concededly not so well situated or of little or no opportunity to know, that they did not hear any warning. The general rule is that "where the witnesses are of equal credit, positive evidence" that a warning was given is "entitled to *more weight*" than that of witnesses who say they did not hear it. (Italics ours). Much depends upon the situation and position of the witnesses and the attention they were giving at the time." [Murray v. Missouri Pacific R. Co., 101 Mo. 236, 242.] In the case at bar the circumstances were such as to make it a question for the jury. [Dutcher v. Wabash Railroad Company, 241 Mo. 137; Hanlon v. Missouri Pacific R. Co., 104 Mo. 381, 388;

State ex rel. v. Kansas City, etc., R. Co., 70 Mo. App. 634, 642.]

Plaintiff's instruction No. 2 told the jury that if they found defendant was operating a street car on the street in evidence and that defendant knew or by ordinary care could have known of the presence of plaintiff and the wagon in which he was riding on said street, and that said highway was constantly used by the public traveling thereon, and that the motorman negligently failed to maintain a reasonable lookout for plaintiff and the general public, and that as a direct result of said negligent failure, if any, said car ran against the wagon and injured plaintiff, then the verdict should be for plaintiff. This instruction is under the second specification of negligence alleged in the petition and is supported by the evidence as hereinabove set forth. As stated before, according to even the defendant's evidence the motorman was running his car twenty miles per hour down a much travelled city thoroughfare at a place where he could only see seventy-five feet ahead of him and where it took that distance for him to stop and longer if conditions were not right. Furthermore, the defendant's evidence showed that he could have seen the wagon twice that far away, and, according to the other evidence, much farther than that, and that during all this time the wagon was on the track, not crossing but going along upon it. The jury could well say from all the evidence that the motorman did not see the wagon until there was not sufficient time to save plaintiff from injury and that the failure of the motorman to see him sooner was due to his negligent failure to keep a reasonable lookout ahead.

It is said the instruction is faulty because it assumes plaintiff was in a position of peril or was on the track at the time when a reasonable lookout if maintained would have been effective. But, as stated before, there was no dispute in the evidence over the fact that plaintiff was then on the track and had been for some time. No one says the wagon was elsewhere than on the track. Even the motorman says it was when he

first saw it, and even if it was then going at an angle to the southwest that would eventually take it off the track it was not going to get off soon enough and the motorman realized this for he at once applied the emergency brake as soon as he saw the wagon. It is clear that the question of whether the wagon was in danger or on the track was not in dispute at the trial. Hence the instruction was not erroneous on the ground complained of. [Davidson v. St. Louis Transit Co., 211 Mo. 320, 356-8; Fullerton v. Fordyce, 121 Mo. 13; Dunavant v. Peniscot Land and Cooperage Co., 188 Mo. App. 83, 93; Sotebier v. St. Louis Transit Co., 203 Mo. 702; Barr v. Armstrong, 56 Mo. 577, 589; Gayle v. Missouri Car, etc., Co., 177 Mo. 427, 447; Pope v. Kansas City Cable Ry. Co., 99 Mo. 400, 406.]

There was no evidence that the wagon was ever on the east side of the street. Hence the instruction did not ignore any defense arising from defendant's evidence nor did it broaden the issues. It is bottomed upon and closely follows the second ground alleged in the petition and it submitted a good case of common law negligence and was sufficiently specific and definite. [Thompson v. Keyes Morshall Bros. Livery Co., 214 Mo. 487, 493; Pope v. Kansas City Ry., supra.] The instruction did not merely tell the jury that if the failure to maintain a reasonable lookout directly resulted in plaintiff's injury then the verdict should be for plaintiff. It went further and required the jury to find that as a direct result of said negligent failure, if any, said car ran against said wagon and injured plaintiff, etc. The plaintiff was entitled to have his case submitted upon both charges of negligence. [Humbird v. Union Street Ry. Co., 110 Mo. 76.] And this was proper notwithstanding there was a charge under the humanitarian doctrine in the petition. [Bruening v. Metropolitan St. Ry. Co., 168 S. W. 248.]

The point that there was no evidence to support the charge of a failure to keep a reasonable lookout is untenable as we have hereinbefore shown.

In instruction No. 5 the jury were told that if the wagon was owned by the driver thereof and that plaintiff employed the owner and exercised no control over the wagon, then the driver was not the servant of the plaintiff and negligence, if any, on his part could not be imputed to plaintiff. This is complained of because it does not submit the question of whether plaintiff was in the exercise of ordinary care or omits to submit the question of plaintiff's contributory negligence. There was no charge of contributory negligence pleaded nor did any appear in plaintiff's evidence. Hence the omission to submit such issue was not error. [Benjamin v. Metropolitan St. Ry. Co., 245 Mo. 598, 614.]

There was no error in refusing to give defendant's instruction No. 4. Every proper element contained therein was covered by the nine instructions given for defendant. The instruction, if given, would have told the jury in effect that the motorman was authorized to approach a wagon on a much traveled street at the rate of twenty miles per hour without warning, having the right to presume that persons on the street would not go upon the track or, if upon the same, that they would get off and avoid being struck.

Instruction No. 12 sought to take from the jury the alleged failure to sound a warning on the ground that there was no evidence that such failure was the proximate cause of plaintiff's injury. But this view is untenable as we have heretofore shown.

The point that the court erred in admitting evidence that the plaintiff coughed up blood is without merit. The only objection made to such testimony was that the question was leading and suggestive and this the court sustained. The petition pleaded, among others, an injury to the lungs and that all of the injuries were permanent.

If there was any error in the closing argument of plaintiff's counsel, the record discloses no exception saved thereto or to the court's failure to rule thereon. There was an exception saved to the action of the

MARCH TERM, 1919.                    305

Kraemmerer v. St. Louis Elec. Term. Ry. Co.

court in ruling on one objection to a statement made in the argument but clearly that statement did not constitute reversible error.

We cannot say the verdict, $5000, is excessive. Plaintiff has suffered much more than merely a fractured collar bone. The record discloses that his left shoulder and arm are permanently impaired, his lungs and left ear also permanently injured, so that from a strong vigorous man he has been reduced to that of one greatly hampered in his movements, unable to do an ordinary man's work, and coughing up blood at intervals. The injuries shown in the record appear to be too serious to justify us in reducing the amount recovered or in setting aside the verdict.

Being of opinion that we are without authority to disturb the judgment, it is accordingly affirmed. The other judges concur.