In the Interest of: D.E.J., J.C.D., M.M.S., Respondents,

v.

G.H.B., Appellant.

No. WD 32604.

Missouri Court of Appeals, Western District.

March 16, 1982.

Theodore M. Kranitz, Kranitz & Kranitz, St. Joseph, for appellant.

Robert B. Randolph, St. Joseph, for respondents.

Before KENNEDY, P. J., and SHANGLER and WASSERSTROM, JJ.

SHANGLER, Judge.

The natural mother appeals the orders by the circuit court of Buchanan County to terminate parental right to each of her three children, DEJ, JCD and MMS. Each of the children was the offspring of a different father and only the boy JCD was of legitimate wedlock. The genetic fathers do not appeal the orders of termination and the adjudications are final as to them.

These proceedings came to this court for review by earlier appeal but were remanded to the court of adjudication, without determination of any substantive issue, for the entry of the *factual finding* § 211.482, RSMo 1978 prescribes as a predicate for a valid order of termination of parental right. [See *In the Interest of D.E.J., J.C.D. and M.M.S. v. G.H.B.*, 609 S.W.2d 472, 474[2] (Mo.App.1980)]. That directive of our mandate was met and the causes are in posture for appellate review.

The orders to terminate the parental rights as to each child rest on separate petitions. The ground each petition alleges to invoke the judicial power to terminate the parental right[1] conforms with § 211.-447.2(2)(h)b, RSMo 1978:

§ 211.447.2: The juvenile court may, upon a petition filed by the juvenile officer, terminate the rights of parent to a child if it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:

(2) When it appears by clear, cogent and convincing evidence that one or more of the following conditions exist:

\* \* \* \* \* \*

(h) The child has come under the jurisdiction of the juvenile court pursuant to the provisions of subdivision (1), paragraph (a), (b) or (c) of section 211.031, and pursuant to an order of the court under section 211.181, and thereafter:

\* \* \* \* \* \*

b. The custody of the child has not been with his parents for six months or longer, or *the child has been under the jurisdiction of the court for one year or longer, immediately prior to the filing of the petition to terminate, and the parent has failed, on a continuing basis, to rectify the conditions which formed the basis of the petition filed under section 211.031, and the order entered under section 211.-181*, and there is reasonable cause to believe that the parent will not, even if given more time, rectify those conditions on a continuing basis, and that the juvenile officer, division of family services or other agency has used reasonable, diligent and continuing efforts to aid the parent to rectify the conditions, and provide on a continuing basis a proper home for the child. [emphasis added]

The *conditions* which induced juvenile court jurisdiction over each child under §§ 211.-031 and 211.181 in the first instance was, according to those several petitions and orders:

that the natural mother [parents] [have] failed to provide care, custody, and support [so that] this child . . . is in need of the care and protection of the Court.[2]

It is these *conditions* which the subsequent petitions to terminate the parental relations allege remain unrectified, and it is these *conditions* which the orders of the court adjudicate as grounds to terminate the right of the parents to each of the children.

The boy JCD [born on June 9, 1970] was adjudicated a ward of the juvenile court on April 11, 1973, and ordered into the temporary custody of the Division of Family Services for foster home placement, where

1. The several petitions alleged identically [except for the name of the child]:

"That the said parents of said minor child have for a period of one year preceding the filing of this petition: [that] JCD [DEJ and MMS, respectively] has been under the jurisdiction of this Court for more than one year immediately prior to the filing of this petition and the parents have failed on a continuing basis to rectify the conditions which form the basis of the petition heretofore filed under Section 211.031, V.A.M.S., and the order entered under Section 211.181, V.A.M.S., and there is reasonable cause to believe that the parents will not rectify those conditions on a continuing basis and the Division of Family Services has used reasonable, diligent and continuing efforts to aid the parents to rectify the conditions, and provide on a continuing basis a proper home for JCD [DEJ and MMS]."

2. The petition under § 211.031 as to the boy JCD alleges also that "the natural mother has abused this child by striking it, and further she allowed it to be in a situation where it became injured." It is fair to say, however, that the ultimate order of termination rests only on the parental failure to provide care, custody and support.

he remains. The girl MMS [born on January 12, 1974] and the boy DEJ [born on May 21, 1975] were adjudicated wards of the juvenile court on October 29, 1975, and ordered into the temporary custody of the Division of Family Services for foster home placement, where they remain. [Thus, for most of their lives, the children have been removed from parental custody.] These formal orders also directed, in various terms, the Division of Family Services to "work with the mother and child in anticipation of returning the child to his mother when she has established a suitable home and environment to properly care for the child."

The mother G was twenty-eight years of age at the date of the termination proceeding.[3] Her domestic career spanned five marriages interspersed with episodes of concupiscence. One of the marriages was bigamous, albeit not as her witting act. Two of her three children were born out of wedlock.

The first marriage was to JRD and produced her only legitimate child, the son JCD [born June 9, 1970]. G separated from husband JRD in October of 1970. Then in January of 1971 G married JWJ. They separated and G thereupon took up residence and cohabitation with NS. G became pregnant by NS, separated from him, and in May of 1973 traveled to Oregon to be with JWJ, still the legitimate husband. G gave birth to her second child, the girl MMS [on January 12, 1974], then returned to Missouri and bore another child [on May 21,

1975].[4] G, with daughter MMS and son DEJ in menage, resumed domestic intimacy with NS in September of 1975. NS abused G and the children. G was prompted to go to California and so relinquished the children MMS and DEJ to the Division of Family Services. The juvenile court in due course assumed jurisdiction over the children MMS and DEJ by the separate petitions and orders [already described] brought and adjudicated on October 29, 1975, under §§ 211.031 and 211.181.

The mother G returned to Missouri and resumed domestic relations with N.[5] In that interim, G was convicted for fraudulent checks and in February of 1976 was jailed and given probation. NS about then was also committed, but to a Colorado prison. Then, in November of 1976, G suffered revocation of probation for failure to make restitution and was recommitted. G was released from jail on that sentence in February of 1977. Then in July of 1977 G married DG, whom she met while in service of the fraudulent check term. DG was taken into police custody soon thereafter, and that liaison ended.[6] G was married to fifth husband GB at the time of the termination proceedings in May of 1979 under our review.

The complaint which brought the firstborn JCD to the attention of the juvenile court in March of 1973—and then culminated in the order to terminate the parental right—was a complaint of physical abuse. That was not the first episode of neglect or

---

3. These facts derive from the full record. Our narrative includes references to the investigation and social study summary of the juvenile officer which § 211.472 requires be submitted to the court to aid the adjudication whether the termination of parental right is in the best interest of the child. The statute directs that the attorneys to the cause before the court have access to the written report. The investigation and social study summary comes to us as a part of the legal file component of the record on appeal [Rule 81.12(a) ].

4. The court testimony was that the daughter MMS was fathered by NS. That attribution of parentage is contradicted by earlier comments to the social worker that the second husband, JWJ sired the two children and, on

another occasion that NS was the father of the daughter MMS. To confound confusion, NS acknowledged paternity to both MMS and DEJ.

5. The record does not show that the marriage between mother G and JWJ was ever validly ended. It is apparent nevertheless that at some point during the intimacy between G and NS [successor cohabitant to second husband JWJ] they submitted to a marriage rite she was unaware was feigned. The discovery of that mockery notwithstanding, G married NS lawfully some time in year 1978.

6. The record intimates that the arrest was for bigamy. DG was already bound in marriage at the time he took G to wife.

want of maternal care for that child. As early as September of 1972, when JCD was two years old, the mother G simply left the child with her former husband [and father of the boy] JRD and his then wife for their permanent care. The state of the child [vermin-ridden and excessively dirty] was such as to prompt complaint to the juvenile court office. Then, in November of 1972 the mother G informed the juvenile court she intended to commit herself to the State Hospital from fear she would harm her son and was granted permission to place the boy in foster care.[7] In December of 1972 G was ready to relinquish the son JCD for adoption by her mother and stepfather, executed the documents to that end, but had a change of heart and was allowed to withdraw the proceedings by the juvenile court judge. Then G established residence with a female friend and the domestic conditions were deemed sufficiently adequate for the return of son JCD to the mother. After the lapse of about a month, in March of 1973, the Division of Family Services was notified by a physician that JCD was treated for severe hand burns and body bruises. The child also suffered with scarlet fever.[8] That complaint led to the formal petition and adjudication of neglect, the return of the child to foster care and, ultimately, to the order to terminate the parental right.

The children MMS and DEJ came to the notice of the juvenile court by the initiatives of the mother, herself. In September of 1975, G once again considered commitment to the hospital for treatment of mental disturbance. That event appears to have been prompted by one of the recurrent incidents of physical abuse inflicted by NS. G felt she could not care for the children and sought to place them in foster care. She relented, but then determined to go to California and once again to place daughter MMS [then less than two years old] and son DEJ [then four months old] in foster care. Then, within the month, G returned to Mis-

souri, resumed domestic relations with NS, and sought return of all the children—JCD, MMS and DEJ. The juvenile court denied the request and continued the children in placement. Then in July of 1976 the mother, with remarriage to first husband JRD and removal to California in contemplation, again requested the court to restore custody of all three children. The court considered the circumstances too unstable, and denied request. The sequence of conviction, probation, revocation and service of sentence ensued, and the other peregrinations we have already described.

The proceedings to terminate the parental rights to the three .children, JCD, MMS and DEJ commenced in May of 1979. The month before, the mother G married fifth husband GB; she was twenty-eight and he, thirty-five years of age. The husband was employed as a boiler operator, a skill learned in the penitentiary. He had recently overcome a tendency to excessive alcoholic drink. G was also gainfully employed on a special project with the Division of Family Services. The combined net income was $680 per month. They lived in an owned mobile home on the acreage of a friend near Jefferson City. GB expressed to the court readiness to assume the obligation of support of the three children. In recent weeks, G and GB had visited the children regularly. G requested the custody of the three children, the grant of the actual custody of the oldest child JCD immediately, but to defer physical placement of MMS and DEJ with the mother until those infants could accommodate emotionally to the change.

At the conclusion of all the evidence, the court heartened by the prospect for stability the new marriage and gainful employment augured, and by other indications of a new departure in life with husband GB, accorded G another chance to establish a stable home for the secure custody of the three children. To that end, the court terminated the parental right of the fathers

---

7. The record does not show whether G in fact submitted to hospital care on that occasion. It is clear enough, however, that G received psychiatric treatment at some time during the course of our history.

8. The burns and bruises were inflicted by NS, the then resident male companion of the mother G.

JRD, NS and JWJ to the respective child, found also that the mother had abandoned the children, but reserved under advisement for six months whether the termination of the maternal right to JCD, MMS and DEJ promoted the best interest of the children. The order of the court restored custody of JCD to G, continued MMS and DEJ in the custody of the Division of Family Services but provided for maternal visitation. It developed that a foster home facility was no longer available for the children MMS and DEJ, so the court restored the custody of those children also to the mother under supervision of the Division of Family Services.

Then on October 22, 1979, on information from the juvenile officer that the mother was unable to provide for the necessary care, custody and support of the children, the court ordered the juvenile officer to take custody of the three children and to place them pending hearing. The evidence of the mother was that soon after the restoration of custody, GB resumed the drink habit, neglected his work, quarreled—so they separated. G returned to St. Joseph with the children, and GB followed. They resumed domestic life, but his drunken antics and aversion to work prompted her to dismiss him from the household. Thus, in August of 1979, only three months after custody was restored on the premise of a stable domestic environment, G found herself unsettled again. An early accident resulted in arthritic knees [by her testimony] and impaired the ability for employment, so she submitted to surgery. G had arranged with a sister to care for the children during the hospital regimen, but she tired of that obligation, and estranged husband GB undertook the task. G returned from the hospital prematurely when she learned GB spent the nights at the home of a girlfriend with the children in tow. G was not physically able to look after the children. The daughter MMS [by then over five years old] was no longer manageable, so G requested that the juvenile officer place her in a foster home. Within days, her public welfare benefits were reduced, there was more contention with GB, G threatened suicide,

and the other two children—JCD and DEJ—were placed in a foster home. G was admitted for psychiatric observation and was released in due course. The three children remain in foster home placement. The marriage to GB subsists, and G continues to hope that her husband will submit with her to a family management counseling service and to a program for alcoholics.

The court took up the question reserved under advisement and in consideration of the evidence terminated the parental right of mother G to the children JCD, MMS and DEJ and directed the children into the custody of the Division of Family Services for placement for adoption. On appeal [*In the Interest of D.E.J., J.C.D. and M.M.S. v. G.H.B.*, 609 S.W.2d 472 (Mo.App.1980)] we determined that the order of termination failed to comply with the requirement of § 211.482 that such an adjudication "shall recite . . . a factual finding of one or more of the conditions set out in section 211.447." Our mandate informed the circuit court that our decision *reversed, annulled and for naught held and esteemed the judgments* [of termination of parental right] *and that the appellant* [G] *be restored to all things lost by reason of said judgment[s]* and adjudged *that the cause be remanded with directions for further proceedings in conformity with the opinion of this court.*

On remand in the juvenile court the mother applied for a change of judge under Rule 51.05. The premise of that initiative was that the mandate restored to G *all things lost by reason of said judgment* —among them [so G contends] the right to a trial and to disqualify the trial judge. The mandate, however, is not the judgment; the appeals opinion is the judgment. *Argeropoulos v. Kansas City Rys. Co.*, 201 Mo.App. 287, 212 S.W. 369, 372[1–3] (1919). The mandate merely constitutes the official communication of the appellate judgment to the subordinate court. *McClellan v. Highland Sales and Investment Co.*, 514 S.W.2d 371, 374[1–4] (Mo.App.1974). When the terms of mandate remand the cause to the subordinate tribunal, the effect is to revest jurisdiction in that court to take the

acts directed. *Durwood v. Dubinsky*, 361 S.W.2d 779, 783[1, 2] (Mo.1962). That direction is determined not only by the terms of the mandate but also by the opinion of the appeals court which the mandate integrates. *Dalton v. Johnson*, 341 S.W.2d 596, 600[3, 4] (Mo.App.1960).

■ The contention of the mother that on remand the juvenile court judge was amenable to removal under Rule 51.05 is valid only if the appeals opinion directed proceedings for a new trial on the cause of action, or on a component issue or an equivalent. *State ex rel. Horridge v. Pratt*, 563 S.W.2d 168 (Mo.App.1978). Our opinion defines exactly the appellate judgment rendered and the scope of the directions to the juvenile court on remand [*In the Interest of D.E.J., J.C.D. and M.M.S.*, supra, at p. 474[2]]:

> The statutorily infirm nature of the order terminating the mother's parental rights, and the confusion which it has generated, prevents this court from reaching any of the substantive issues tendered on appeal. The judgment of the trial court is reversed and the cause is remanded for further proceedings, including the taking of further evidence if deemed necessary or deemed advisable by the trial court, with directions that any order terminating the mother's parental rights be in compliance with Section 211.482, supra.

The terms of mandate, descriptive and ceremonial, conformed to the terms of the appellate judgment, readily disclose that the remandment was for a proceeding to formulate findings of fact on a record already complete—as an adjunct to the original trial and not a new trial. That the direction of the opinion invests the juvenile court with discretion [not exercised] to receive further evidence does not transform the proceeding into a new action—and hence occasion for change of judge Rule 51.05. That option for evidence was, in the context of the appellate judgment, to ensure that "any order terminating the mother's parental rights be in compliance with Section 211.482." The request for change of judge was properly denied.

■ We reject also, on the same rationale, the contention that the refusal by the juvenile court judge on remand to receive evidence tendered by the mother violated the appellate mandate. G asked the court to receive her testimony that the decision to submit to knee surgery [the event which led to the final act of relinquishment by the mother of the custody of the three children to the court—and, ultimately to the termination orders] was an urgent medical necessity, and not merely an avoidable option. The *further proceedings* directive to the trial court was to formulate the findings of fact § 211.482 as prerequisite to judgment and review. The evidence G tendered to the court on remand, on the other hand, was to rebut a record already made on the substantive issues, and so beyond the authority of the mandate and the appellate opinion.

■ The juvenile court judge on remand entered findings of fact conformed to the prescriptions of § 211.482. The mother on this appeal complains nevertheless that the court relied on evidence beyond the record —specifically, "the written report by Mary Peppel of the Division of Family Services dated October 5, 1978." That report [an investigative and social study summary of the interrelations between the G family and the Division of Family Services and the juvenile court] is made an official and necessary evidential component of any nonvoluntary termination of parental right proceeding by § 211.472. The purpose is to aid the court to the decision as to *whether termination is in the best interests of the child.* The statute directs that "[a]ttorneys representing parties before the court shall have access to the written report [and] [a]ll ordered evaluations and reports shall be made available to the attorneys representing parties before the court at least fifteen days prior to the hearing." The report comes to us as part of the official supplemental legal file [Rule 81.12(e)] and so as a component of the record on appeal [Rule 81.12(a)]. There is no contention that counsel was denied access to the report or that for any reason the contents were not

suitable to the statutory purpose.[9] The statute mandates the report as an aid to the adjudication and so intends that the facts related in the report have the effect of evidence on the issue "whether the termination is in the best interests of the child." The report was an indispensible component of the juvenile court adjudication, and hence of the record on the appeal. The contention that the judgment rests on facts beyond the record is denied.

■ The mother contends, finally, that the adjudications to terminate the parental right do not rest on the clear, cogent and convincing evidence required by § 211.447.-2(2). The orders to terminate the parental right to the children JCD, MMS and DEJ were entered under § 211.447.2(2)(h)b: that is, on allegations of petition and proof that each child came under the jurisdiction of the juvenile court pursuant to § 211.031 [parental neglect to provide for the care and support of the child] and that:

> the child has been under the jurisdiction of the court for one year or longer, immediately prior to the filing of the petition to terminate, and the parent has failed, on a continuing basis, to rectify the conditions which formed the basis of the petition filed under section 211.031, and the order entered under section 211.081, and there is reasonable cause to believe that the parent will not, even if given more time, rectify those conditions on a continuing basis....

Thus, the burden of the evidence was to prove, by clear, cogent and convincing evidence, that the mother failed to rectify the neglect of the children [the *condition* which induced the original assumption of juvenile court jurisdiction over the children] and that the evidence gives reasonable cause to believe the mother will not rectify the condition, even given more opportunity.[10]

The juvenile court jurisdiction was assumed over each child by a petition under § 211.031 to protect them from the neglect of the mother and other parent. The boy JCD [now almost twelve years of age] has remained a ward of the court since his third year. The girl MMS [now eight years of age] and the other boy DEJ [now almost seven years of age] were relinquished to the juvenile court by the voluntary act of the mother when the girl was about a year of age and the boy only months old. They remain wards of the court. Thus, the one year exercise of jurisdiction prerequisite for an order of termination under § 211.447.-2(2)(h)b was proved. The *condition* for that exercise of juvenile court jurisdiction, as we note, was the neglect of the mother [and other parent] to provide for the care, custody and support of the children. The detail of the evidence sustains also, by the clear, cogent and convincing quantum, that the *condition* which induced the assumption of jurisdiction over the children under §§ 211.-031 and 211.181 persist and that the mother

9. We note only, without other surmise, that counsel on appeal was not the counsel at the trial.

10. The argument of the mother supposes that the orders of termination rest on the *neglect* ground of § 211.447.2(2)(b):

> "*The parent has neglected, without good cause, the child for a period of six months prior to the filing of the petition.*"

That procedure for termination of the parental right rests on the prescribed period of neglect, without more. The orders on appeal, however, rest on § 211.447.2(2)(h):

> "[That] *the child has come under the jurisdiction of the juvenile court pursuant to the provisions . . . of section 211.031, and pursuant to an order of the court under section 211.181, and thereafter*
>
> \*      \*      \*      \*      \*      \*

> "b. *the child has been under the jurisdiction of the court for one year or longer,*" etc. [supra] [emphasis added]

It happens that the initial jurisdiction of the juvenile court over the three children under §§ 211.031 and 211.181 was for *neglect*. Although §§ 211.031 and 211.181 are not, strictly, *in pari materia* with the Termination of Parental Rights sections 211.442 to 211.492, the *neglect* definition of § 211.447.2(2)(b): "*failure of a parent to provide, on a continuing basis, the care, guidance and control necessary for the physical, mental, and educational well-being of a child*" [emphasis added] suits the proof required for the termination of the parental right based upon an uncorrected *condition* of neglect which induced initial jurisdiction over the child under § 211.031 and then becomes the basis for termination of parental right under § 211.-447.2(2)(h)b.

will not likely correct the cause of the neglect, given more time. The failure has been, as the order of termination finds, that G continues unable to establish a suitable home or environment to provide for the care of each child.

The evidence sustains the sense of the juvenile court adjudication that G was hapless as a person and heedless of the welfare of the children. She fell into a succession of male consorts without regard to the consequences to the children. She was unable to resist return to NS although his tendency was to abuse the children as well as herself. That G was fitful as a mother and never made serious attempt—except, perhaps, at the very last—to establish a suitable home or environment for the care of the children, as the court found, was manifest by a continuous movement—from male to male and from place to place. Her tendency to deposit the children with the Division of Family Services or with someone else when her whim took her to California, or to Texas, or to some other destination, was without concern for the welfare of the children. She fell into crime. The result was that the children suffered and she became alien to them. They returned from visits with her emotionally upset. DEJ was malnourished. MMS developed a speech impediment and an aberration of personality. The mother could not longer control MMS. G herself tended to instability. She responded to her failures as a mother by periodic relinquishment of the children with the juvenile authority, or by threats of suicide or by voluntary commitment to the hospital.

The statute invoked to terminate the parental right [§ 211.447.2(2)(h)b] requires proof also that the juvenile officer or other agency used reasonable, diligent and continuing efforts to aid the parent to rectify the condition, and provide on a continuing basis a proper home for the child. Conformable to that end, the order of the juvenile court under § 211.181, at the very outset of exercise of jurisdiction over each child directed that the [then]

> Family and Children's Service of the Department of Public Health and Welfare

> . . . work with the mother and child in anticipation of returning the child to his mother when she has established a suitable home and environment to properly care for the child.

To that rehabilitative end, the order also provided for the right to visitation. The social workers communicated that aim to G and that their function was to help her to that goal. G herself acknowledged that the restoration of the children depended upon a stable home. Yet, despite the persistent and almost indulgent aids of the social agencies, she made no serious effort to accomplish that end. The visitation visits were often scheduled but not kept. She gave as reason that NS intimidated her against that practice; even by threats to kill her. Yet she returned to him although that meant a curtailed relationship with the children. It was as probable that G neglected visitation because she was in constant movement from place to place. [One span—from May of 1977 to May of 1978—involved at least seven displacements.] In the meanwhile, the most significant relationships of the children were with the foster parents, not the mother. The final effort by the juvenile authority to reunify the family was when the court, heartened by the new marriage with GB and the augury for stability from the employments of the spouses, ordered the three children into the custody of G and deferred judgment on the termination petitions. That last prospect dissipated four months later when the husband reverted to drink and the marriage collapsed. G returned the children to the juvenile authority voluntarily, and threatened suicide and entered the psychiatric ward of the hospital.

G argues, nevertheless, that the cause for the disruption with the children was a necessary surgery which bereft her of capacity to care for them despite her thoughtful arrangements—the sister who agreed to look after them during that interim later refused, and the former husband who then assumed that responsibility philandered in the presence of the children. G insists that all else to the contrary notwithstanding, she hopes to convince estranged husband GB to

submit to a marriage counselor and a program for alcoholics and, that accomplished, a suitable home for the children will eventuate. The juvenile court judge expressed that the best interest and welfare of the children did not allow such a risk.

The record shows that the children are presently harbored together in a foster home. That marks the first time they have dwelt together in a stable home environment. Only on two other occasions, with the mother, have they shared a household. Each child has lived the greater part of life separated from the mother, as a matter of her choice. The order of the juvenile court judge that the termination of the maternal parental right to JCD, MMS and DEJ promotes the best interest and welfare of the children is sustained. *In the Interest of M— K— P—*, 616 S.W.2d 72 (Mo.App.1981); § 211.492.

The judgments are affirmed.

All concur.