Jerome **WAKILI**, Appellant,

v.

Robin **WAKILI**, Respondent.

No. WD 50185.

Missouri Court of Appeals,
Western District.

March 26, 1996.

David R. Browning, The Browning Group, Independence, for appellant.

Kay Madden, Slough, Connealy, Irwin & Madden, Kansas City, for respondent.

Before ELLIS, P.J., and HANNA and SPINDEN, JJ.

ELLIS, Presiding Judge.

Jerome Wakili appeals from a decree of dissolution and an order determining credits and arrearages of maintenance and child support entered by the Jackson County Circuit Court on August 31, 1994. Jerome and Robin Wakili were married on December 26, 1985. One child, Mansa Wakili, was born of the marriage on August 8, 1987.

The facts leading up to the dissolution are not in dispute and therefore need not be recited. However, the procedural history of the case is extensive and complicated, and is intertwined in many of the issues raised in this appeal. Therefore, we summarize the chronology of events.

February 15, 1991—Robin received a full order of protection which ordered Jerome to leave the marital home and pay the first and second mortgages on the home.

February 20, 1991—Jerome filed a petition for dissolution in Jackson County Circuit Court.

April 4, 1991—Robin filed an answer and cross petition and a motion for temporary maintenance, child support and mortgage payments.

April 15, 1991–Robin filed a motion for temporary restraining order and order to show cause why temporary injunction should not

be granted, requesting the court to prevent Jerome from disposing of marital assets.

April 18, 1991—Jerome filed a response to Robin's April 15 motion. The circuit court issued a temporary restraining order preventing Jerome's squandering or otherwise disposing of the parties' assets, and an order to show cause why preliminary injunction should not be granted.

May 14, 1991—The circuit court entered an order granting the preliminary injunction, prohibiting Jerome from disposing, encumbering, or otherwise squandering any of the parties' assets, except for specifically enumerated reasonable living expenses.

July 24, 1991—Robin filed a motion to compel discovery and for temporary child support and mortgage payments.

August 13, 1991—Jerome filed a response to Robin's July 24, 1991 motion.

August 20, 1991—The court sustained Robin's motion to compel discovery.

August 21, 1991—A special master was appointed to hear evidence on the motion for temporary child support and mortgage payments.

August 26, 1991—The special master requested that she receive either copies of discovery or forms 1407(a) and (b) from both parties by noon, August 30, 1991.

September 8, 1991—Robin's attorney filed a motion for sanctions and attorneys fees, stating she had not received Jerome's responses to her first interrogatories.[1]

September 17, 1991—The master filed her report with the court.

October 23, 1991—The trial court (The Honorable Edith Messina) adopted the master's report and entered an order pendente lite in which it ordered Jerome to pay $669.00 per month temporary child support, retroactive to August 1, 1991, and $705.00 per month temporary maintenance, payment of which could be satisfied by payment of both the first and second mortgages on the marital home. The order

---

1. Jerome had filed his responses to first interrogatories with the court on August 26, 1991, but no certificate of service to Robin's attorney appears in the file. The responses did state a copy of them was mailed to Robin's attorney, but presumably (because she filed a motion for sanctions), she did not receive them.

also allowed a fee for the master's services of $625.00 to be taxed as costs and assessed as provided in the final decree. Neither party appealed from this order.

October 24, 1991—The trial court sustained Robin's September 8, 1991, motion for sanctions and struck Jerome's pleadings.

November 21, 1991—The parties entered into a separation agreement which was filed with the court on December 12, 1991. In that agreement, the parties agreed, among other things, that Jerome would pay Robin $250.00 bi-weekly in child support and that both parties waived any maintenance. Jerome received possession of the marital home and paid Robin $3,000.00 for her interest in the home plus $1,000.00 "to assist in relocation." Jerome assumed the two mortgages on the marital home. The agreement also divided the parties' automobiles, personal property, and debts. Additionally, the agreement provided that the parties would have joint legal custody of Mansa and that Robin would have primary physical custody. It also provided for visitation, medical care, education, and other issues regarding Mansa. The agreement specifically provided that both parties were represented and advised by their respective attorneys.

November 26, 1991—Robin sent to the court a letter in which she asked the court to enforce the October 24, 1991 PDL order "before considering our agreement." The letter spoke of the pressure and duress the divorce was causing her as well as the economic stress she was experiencing, and she told the court she could no longer afford an attorney.

December 12, 1991—The separation agreement was filed with the court.

January 24, 1992—Robin, through counsel, filed a motion to rescind the separation agreement.

February 13, 1992—Jerome filed suggestions in opposition to the motion to rescind.

February 21, 1992—Judge Messina transferred the cause to another division pursuant to Robin's request for change of venue.

March 4, 1992—Jerome filed a motion and suggestions to reinstate his pleadings.

March 5, 1992—Robin filed suggestions in opposition to Jerome's motion to reinstate his pleadings.

March 6, 1992—The Honorable Vernon Scoville held a hearing on the dissolution.

April 2, 1992—Judge Scoville entered an amended decree of dissolution which, among other things, awarded sole custody of Mansa to Robin, provided for visitation, ordered Jerome to pay $1,000.00 per month child support, ordered maintenance, and divided the parties' property and debts. The decree did not mention the separation agreement.

May 1, 1992—Jerome filed a motion to correct judgment, citing several errors in the amended decree.

May 7, 1992—Robin filed a reply to Jerome's motion to correct judgment.

June 24, 1992—The court entered a final amended decree of dissolution. The final amended decree awarded sole custody of Mansa to Robin with specific visitation by Jerome. Jerome was to pay $1,000.00 per month in child support and an additional $200.00 per month in child support arrearages totalling $4,518.80. Jerome was also required to provide health and dental insurance for Mansa. He was further ordered to pay $4,500.00 to Robin for attorney's fees. Robin was awarded the marital home, all proceeds from a personal injury claim she had, one-half of all bank accounts in Jerome's name, an automobile, and other personal property. She was to pay certain debts, and both mortgages on the marital home after March, 1992. Jerome received two automobiles and any interest he had in any business. Jerome was to pay certain debts and both mortgages on the home through March, 1992. The final decree did not mention the parties' separation agreement.

July 22, 1992—Jerome appealed the June 24, 1992, final amended decree to this court.

April 15, 1993—Robin filed with this court a "First Amended Motion for Order for Remand" in which she "concede[d] and confesse[d] the errors as set forth in [Jerome's] brief."

April 21, 1993—This court issued an order reversing the June 24, 1992, final decree

and remanding the case to the trial court for rehearing.

May 19, 1993—Jerome filed an application for change of trial judge and again filed a motion to reinstate his pleadings.

May 26, 1993—Robin filed suggestions in opposition to Jerome's application for change of judge and suggestions in opposition to his motion to reinstate his pleadings.

May 27, 1993—Judge Scoville transferred the cause to Judge Mauer.

June 24, 1993—Robin filed a motion to appoint a court administrator as trustee for receipt of temporary maintenance payments and application for order for wage withholding.

July 2, 1993—Jerome filed a motion to dismiss Robin's June 24 motion.

July 20, 1993—Judge Mauer sustained Robin's motion to appoint the court administrator's office as trustee to receive temporary maintenance payments and denied Jerome's motion to reinstate his pleadings.

July 28, 1993—Jerome filed a motion for reconsideration and for oral argument and to determine the status of discovery, pleadings and orders.

August 6, 1993—Robin filed suggestions in opposition to Jerome's July 28 motion.

September 1, 1993—The cause was again transferred due to a conflict.

September 8, 1993—Judge Preston Dean entered an order summarizing the posture of the case. He stated in the order that on June 24, 1992, a final amended decree of dissolution of marriage was entered by Judge Scoville but that on April 21, 1993, that decree was set aside by this court. He noted it was unclear as to why we set aside the decree. He stated, "In any event, Mr. and Mrs. Wakili are still married and the case is still pending. Whatever orders were in place before the decree remain in place." He further stated that the application for change of judge was granted, that Jerome's motions to reinstate his pleadings were denied, and Robin's motion to appoint the court administrator as trustee for wage withholding was granted. He ordered the parties to complete discovery and set the case for a hearing. He said, "Why that cannot be done rather expeditiously is unclear."

February 28, March 10, 11, 24, 25, and May 27, 1994—The Honorable Justine Del Muro held a (second) trial. The issues at trial were the custody of Mansa, support and visitation, division of property and debt, attorney fees, and arrearages. At trial, Jerome's pleadings were reinstated over Robin's objection. The court took the matter under advisement. Meanwhile, Jerome filed several other motions, some of which were filed *pro se*, and both parties filed trial briefs with the court.

July 26, 1994—The court issued an order in which it resolved two issues: first, it found that our reversal of the June 24, 1992, amended final decree of dissolution gave Judge Dean jurisdiction to enter his September 8, 1993, order continuing the pendente lite order for temporary maintenance and child support, and therefore, the pendente lite order was still in effect and binding on the parties; second, the court found that the November 21, 1991, settlement agreement had been rescinded or abandoned by the parties by the entry of the June 24, 1992, decree. She said:

This court need not make that determination [regarding conscionability of the agreement] because this agreement was abandoned and rescinded by the parties when they appeared before Judge Scoville and a new agreement inconsistent with the terms of the prior agreement was entered into by way of decree. Petitioner by his own admission states that at the time Judge Scoville heard the case, a new agreement had been entered into and that the parties were ordered to reduce those *new* terms into writing.

She then denied Jerome's motion to enforce the settlement agreement.[2]

August 1, 1994—The court entered a memorandum which addressed Jerome's request

2. Judge Del Muro issued an Order Nunc Pro Tunc on July 28, 1994, replacing the July 26 order but made no substantive changes.

for findings of fact and conclusions of law on 52 factual issues. The court also entered an order stating that the PDL order regarding maintenance and child support remained in effect throughout the proceedings except for the period while the first appeal was pending in this court. She required the parties to submit further evidence verifying the payment of child support, day care and mortgage payments made by either party from October 23, 1991, to June 24, 1992, and from April 21, 1993, to February 28, 1994.

August 12, 1994—Jerome filed a request for crediting under order pendente lite and receipts reflecting payments he allegedly paid for child support and maintenance.

August 18, 1994—The court issued another order requiring the parties to produce documentation verifying the payment of child support, day care and mortgage payments.[3]

August 31, 1994—The court entered a decree of dissolution which, among other things, dissolved the marriage, awarded sole custody of Mansa to Robin with specific visitation to Jerome, ordered Jerome to pay $600.00 per month child support, awarded the marital home to Robin, ordered Robin to pay the two mortgages and to pay Jerome $5,250.00 for his share of the equity in the home. It found the parties had waived maintenance and therefore, the maintenance payments were to cease February 28, 1994. The court ordered no award for attorneys fees and Jerome was to pay the court costs. Also on August 31, 1994, the court entered an order determining maintenance and child support arrearage.

September 22, 1994—Jerome filed a motion to reopen evidence regarding custody and support.

September 30, 1994—Robin filed suggestions in opposition. This motion was not ruled upon by the trial court.

October 7, 1994—Jerome filed a notice of appeal with this court regarding the August 31, 1994, order determining maintenance and child support arrearages and the August 31, 1994, decree of dissolution.

Jerome raises eighteen points in his appeal of the August 31, 1994, orders. We address all points raised, but several are combined because of their commonality.

First, Jerome points to the order entered by this court on April 21, 1993, in which we reversed the circuit court's June 24, 1992, final amended decree of dissolution and remanded the cause for further proceedings. Jerome contends the trial court erred in its August 31, 1994, decree of dissolution because it failed to restore his costs, charges and other losses incurred in his first appeal. He contends our mandate ordered the trial court to award both attorneys fees and costs to him. Jerome states "this court ordered that the prior dissolution order of the Circuit [sic] of Jackson County was void and held for naught and that the husband-appellant recover all that he had lost by virtue of that order, including his costs and charges incurred."

This court's April 21 order states, in pertinent part:

Now on this day, the Court having been sufficiently advised of the premises, orders that the judgment of the Circuit Court of Jackson County be reversed and for naught held, and that the Appellant be restored to all things lost by reason of the judgment. It is further ordered that the cause be remanded to the Circuit Court of Jackson County for further proceedings therein, in conformity with the Order of this Court herein delivered; and that the Appellant recover against the Respondent the costs and charges herein expended and have execution therefor.

Jerome points to the language that he "be restored to all things lost by reason of the judgment" and that he "recover against Respondent the costs and charges herein expended" and interprets our order to mean he was entitled to recover all his costs expended in pursuing that prior appeal, including $9,575.00 in attorney's fees.

3. This order also ordered that the parties not contact the circuit court administrator's office to obtain credit. The court made this order because Jerome's attorney had improperly requested the administrator's office to give Jerome a credit of over $18,000.00, which the administrator's office did.

Jerome's contention fails because an award of costs on appeal does not automatically include attorneys fees. In fact, attorney fees are generally not considered to be costs. *Reed v. City of Springfield,* 841 S.W.2d 283, 286 (Mo.App.1992). The case cited by Jerome, *Trapani v. Trapani,* 686 S.W.2d 877 (Mo.App.1985), does not stand for the proposition that costs include attorney fees; it merely held that attorneys fees *could be awarded. Id.* at 878. In addition, our order that Jerome "be restored to all things lost by reason of the judgment" refers to the procedural posture of the case (that the judgment is reversed and held for naught) and not to attorneys fees. Thus, the trial court was not ordered by our April 21, 1993, mandate to award attorneys fees and the trial court did not err in failing to do so.

Jerome raises several points regarding the validity of the October 23, 1991, PDL order and the November 21, 1991, separation agreement and as to which one was in effect following our remand of the case. The September 8, 1993, order entered by Judge Dean declared "whatever orders were in place before the decree remain in place." In other words, he found that the PDL order, rather than the separation agreement, was in effect both before and after our remand. Also, Judge Del Muro found in her July 26, 1994, order that Judge Dean had jurisdiction to enter the order continuing the PDL order and that it was still in effect and binding on the parties. Jerome asserts several points of error based on this finding, and alleges the parties should be bound by the separation agreement rather than the PDL order.

First, Jerome contends the trial court erred when it initially entered the October 23, 1991, PDL order for maintenance and child support because the evidence before the court supported only the entry of an order for child support in that Robin was capable of being self-supporting and that Jerome was unable to meet his reasonable needs and pay her maintenance. To support his contention, he points to the trial court's August 31, 1994, finding that the order PDL exceeded the needs of the parties, and he claims the order PDL violated § 452.335.2(8), which requires the trial court to balance temporary allowances against his ability to pay. He claims the PDL order did more than maintain the status quo, which is the purpose of PDL orders, *Tzinberg v. Tzinberg,* 631 S.W.2d 681, 683 (Mo.App.1982), and therefore, he contends, the order PDL was inequitable. In fact, Jerome claims that the court's giving Robin 36 months of $774.00 more than the $600.00 child support awarded in the final decree resulted in a $27,864.00 windfall to her.

Jerome's contention is without merit. An order pendente lite is a final order from which an appeal can be taken. *Johnson v. Johnson,* 894 S.W.2d 245, 247 (Mo.App. 1995). Jerome did not appeal the order PDL. It is too late for him to complain about its contents now. As such, we will not review the appropriateness of the temporary maintenance and child support awarded in the PDL order.

Jerome concedes that "generally such an abusive order might have been appealed," but states that the separation agreement, which was signed after the order PDL was entered, superseded the order PDL regarding the maintenance. In other words, he contends the separation agreement rather than the PDL order should be enforced.

Before addressing this specific contention, we point out that a significant number of Jerome's arguments on this appeal focus on the effect, or lack thereof, of the separation agreement signed by the parties on November 21, 1991. For the most part, Jerome asserts the agreement was voluntarily entered into, was not unconscionable, was binding on the parties, and therefore, should have been approved and enforced by the trial court. We therefore analyze the broad issue of the effect of the separation agreement before considering Jerome's specific claims.

As noted in the chronology, *supra,* the parties signed the separation agreement on November 21, 1991. It was filed with the court on December 12, 1991. However, prior to that date, on November 26, 1991, just five days after the signing, Robin sent a letter to the court asking the court to enforce the PDL order before considering the agreement, and she generally spoke of the pressure and duress the dissolution proceedings

were causing her and that she could no longer afford an attorney. From the record, it is unclear whether the agreement was ever presented at any of the court proceedings with the request that it be approved and enforced. It certainly was not at the first trial on March 6, 1992, which resulted in the June 24, 1992, decree. Likewise, Judge Del Muro, in her findings after the second trial, found that neither party had called the agreement up for hearing. However, Jerome did ask the court to enforce the agreement at the second trial.

■ A separation agreement entered into during the course of, or in anticipation of, a dissolution proceeding is unique. The nature of such agreements was well stated in *In re Marriage of Brinell,* 869 S.W.2d 887 (Mo. App.1994), where the court said:

> A separation agreement is unique in that the trial court must review it and, considering the parties' economic circumstances and any other relevant factors, find it conscionable before it takes effect. § 452.325.2. There are thus actually three parties who must approve of its terms before it may be enforced. In this respect a separation agreement under § 452.325.1 differs from a settlement agreement in a typical civil suit. The statute specifically asserts that the purpose of such agreements is "[t]o promote the amicable settlement of disputes between the parties to a marriage." § 452.325.1. Given the stated purpose of separation agreements and the fact that to some extent they are three-party agreements, we find that the legislature intended that the husband and wife jointly, while in agreement, come before the court and present their proposed settlement for the court's approval. Either one or both of the parties may offer the existing agreement when presented.

*Id.* at 888 (quoting *O'Neal v. O'Neal,* 673 S.W.2d 126, 127–28 (Mo.App.1984)).

■ The record is clear that the Wakilis were not in agreement when they "present[ed] their proposed settlement for the court's approval," if in fact it was ever actually presented. Robin informed the court by letter on November 26, 1991, that she wished to rescind the agreement. She did this even before the agreement was filed with the court. She also filed a motion to rescind the agreement before it was presented to the court. Thus, there can be no question that the Wakilis did not "jointly, while in agreement, come before the court and present their proposed settlement for the court's approval." As in *Brinell,* by the time the agreement was presented (or at least the trial court was asked to enforce it), the parties did not agree, and approving such an agreement would not promote amicable relations between the parties which is the purpose behind the enactment of § 452.325.[4] Because the parties were no longer in agreement (if they ever had been), the trial court was neither required to, nor did it approve, the agreement and therefore, it was never enforceable.

We now turn to some of Jerome's specific contentions. First, he points out that the court never addressed the conscionability of the separation agreement. The short answer is that the trial court was not required to address the conscionability of the agreement because, as we have just discussed, the agreement was never presented to the court while the parties were in agreement. Nevertheless, Jerome asserts that a separation agreement is binding on the court unless the court finds it to be unconscionable. *See Allard v. Allard,* 856 S.W.2d 64, 69 (Mo.App. 1993). While this statement is true, as held in *Brinell* and *O'Neal,* a condition precedent to the court's consideration of a separation agreement is that the parties be "presently in agreement" at the time the agreement is submitted to the court. *Brinell,* 869 S.W.2d at 888. Since there was no present agreement by the parties at any time the issue was

---

4. Note that *Brinell* specifically qualified the *O'Neal* holding by stating that it was not necessary for the parties to be present in the court to present the agreement together. The court stated, "In the absence of a party who signed the agreement the trial court can properly assume that agreement to it continues unless the record indicates otherwise." *Brinell,* 869 S.W.2d at 889. Even so, in the case at bar, the record before the trial court, both at the first trial and the second, clearly indicated the parties were not still in agreement when the court was presented with the agreement.

presented to the trial court, there was nothing before the court on which it could make a determination of conscionability.

Jerome next contends that, assuming the separation agreement was never enforceable and the PDL was enforceable prior to our remand, the PDL merged into Judge Scoville's June 24, 1992, final decree and was permanently extinguished by our reversal when he appealed that order. It is true that a PDL order is a temporary order pending a final decree and that the termination of the underlying dissolution terminates the PDL award. *Hansen v. Hansen*, 734 S.W.2d 287, 288 (Mo.App.1987).

However, Jerome's argument that the PDL order was extinguished when the final decree was entered and reversed fails because assuming, without deciding, that the PDL order was extinguished upon entry of the final decree and that our reversal and remand of the case did not reinstate it,[5] the trial court had the jurisdiction to revive it following our remand. *D.E.J. v. G.H.B.*, 631 S.W.2d 113, 117–18 (Mo.App.1982) (remand on appeal revests jurisdiction in the trial court). PDL orders for child support and maintenance are designed to maintain the status quo pending final judgment. *Tzinberg*, 631 S.W.2d at 683.

> Section 452.315, RSMo (1986) grants a trial court authority to order temporary maintenance in a "proceeding for dissolution of marriage." A proceeding for dissolution of marriage is a single proceeding or action which does not end until all matters are finally adjudicated even though an appeal is not taken from the portion of the judgment which dissolves the marriage.

*Preston v. Preston*, 779 S.W.2d 363, 364 (Mo.App.1989). In other words, the trial court had the authority to order the temporary maintenance continued until all matters in

the case were finally adjudicated. Judge Del Muro specifically found in her July 28, 1994, order that Judge Mauer issued an order appointing the court administrator as trustee for the receipt of temporary maintenance on July 28, 1993 and that Judge Dean issued an order on September 8, 1993 continuing temporary maintenance and child support. Both of those orders were entered after the case had been remanded by our order for new trial. She specifically found that Judge Dean had the jurisdiction to make those findings to continue the temporary maintenance and child support in order to maintain the status quo. Under the principle declared in *Preston*, she was correct that Judges Dean and Mauer had the authority to make those findings. Additionally, the trial court has the power to make a PDL order regarding maintenance retroactive. *Roedel v. Roedel*, 788 S.W.2d 788, 791 (Mo.App.1990). As such, the trial court had the power to determine that the PDL order had been in effect back to the point of remand.[6]

In fact, Jerome concedes that the trial court had the power to issue new PDL orders after the remand, but he contends that if the trial court's July 20, 1993, and September 8, 1993, orders were new orders of temporary maintenance, he was entitled to notice and argument on them. He claims he did not receive notice and therefore, they were void for want of subject matter jurisdiction, citing *Greene v. Greene*, 368 S.W.2d 426, 428 (Mo.1963), and *In re J.A.P.*, 546 S.W.2d 806, 808 (Mo.App.1977). However, his contention that he had no notice or opportunity to be heard on the issue of the continuation of the PDL order is refuted by the record. In response to Robin's motion to appoint the court administrator as trustee for receipt of temporary maintenance, Jerome filed a motion to dismiss her motion, raising the argument that the PDL order had been terminat-

---

5. In *Fischer v. Seibel*, 733 S.W.2d 469, 474 (Mo.App.1987), the court found that the grant of a new trial automatically reinstated the PDL order regarding temporary maintenance without any further action on the wife's part.

6. *See also Goller v. Goller*, 758 S.W.2d 505, 510 (Mo.App.1988) (holding a temporary maintenance order should have remained in effect pending the final disposition of the appeal);

*Fischer v. Seibel*, 733 S.W.2d 469, 474 (Mo.App. 1987) (the trial court's granting a new trial after issuing a decree of dissolution reinstated the wife's right to temporary alimony without further action on her part); *Smith v. Smith*, 176 S.W.2d 647, 648–49 (Mo.App.1944) (an order for temporary support remains in effect until final conclusion).

ed. He also filed a motion requesting the court to determine the status of discovery, pleadings and orders, again raising the issue of the termination of the PDL order. Judge Dean's September 8, 1993 order (in which he specifically found that the PDL order remained in effect) was the result of that motion.

Moreover, Jerome appealed neither Judge Mauer nor Judge Dean's orders regarding the continuation of the PDL order. Again, as pendente lite orders in domestic cases are appealable, *Buder v. Buder,* 824 S.W.2d 483, 485 (Mo.App.1992); *Johnson v. Johnson,* 894 S.W.2d 245, 247 (Mo.App.1995), and Jerome appealed none of the PDL orders, he cannot complain about them now.

Next, Jerome contends Judge Dean erred in his September 8, 1993, order where he declared that as a result of our April 21, 1993, reversal and remand of the June 24, 1992, decree of dissolution, the Wakilis were still married. Jerome claims that neither party appealed the actual dissolution or contended the marriage was not irretrievably broken. He complains only because, if the parties were no longer married after the June 24, 1992, decree of dissolution, he would not be obligated to pay temporary maintenance under the PDL order after that date.

 The answer to this contention is two-fold. First, this court's order of remand specifically declared that the June 24, 1992, "judgment of the Circuit Court of Jackson County be reversed *and for naught held.*" (Emphasis added). The language is unambiguous, and clearly means that the judgment of June 24, 1992, is void and of no force or effect. Secondly, even if such were not the case, as we have discussed in detail, *supra,* § 452.315 grants a trial court authority to order temporary maintenance in a "pro-

ceeding for dissolution of marriage," which continues until all matters are finally adjudicated. *Preston,* 779 S.W.2d at 364. In fact, *Preston* specifically held that this rule applies "even though an appeal is not taken from that portion of the judgment which dissolves the marriage." *Id.*[7] Thus, even assuming Jerome's appeal did not include the trial court's declaration that the marriage was terminated, the court had the authority to continue the temporary award throughout the case and until all the matters were finally adjudicated.[8]

 Jerome cites several additional errors made by Judge Del Muro in her August 31, 1994, decree of dissolution. For instance, he complains about the trial court's finding his pleadings were stricken and proceeding on Robin's cross petition. He claims this finding was against the weight of the evidence. This contention is meritless. In the first place, Jerome admits the trial court reinstated his pleadings. Furthermore, even assuming the court did proceed on Robin's cross-petition, Jerome was allowed to present evidence on all issues and he points to nothing in the record to show that the trial court discounted any of his evidence. Therefore, he demonstrates no prejudice.

Jerome next alleges the trial court erred in finding he had engaged in certain misconduct, specifically, that he married another woman in Nigeria while he was still married to Robin and that he refused to cooperate in the sale of the marital home.

Regarding the finding that he had not cooperated in the sale of the marital home, Jerome again attempts to rely on the separation agreement under which he was to receive the house. He contends that because he was to receive the house under that

---

7. Section 452.335 also contains the language, "In a proceeding for nonretroactive invalidity, dissolution of marriage or legal separation," so the same rationale applies.

8. Jerome cites *Fischer v. Seibel,* 733 S.W.2d 469, 471–72 (Mo.App.1987), which applied the doctrine of severable finality and held the parties were divorced even though the issues regarding the division of marital property were not settled. *Fischer* is distinguishable, however, because in that case, the court entered a separate decree in

which it declared the marriage dissolved, but specifically continued the case regarding property division to a later date. Neither party appealed the dissolution decree. In any event, as the *Fischer* court pointed out, the purpose of applying the rule is to free the parties to remarry where they do not question the dissolution of the marriage. *Id.* at 472. Furthermore, the *Fischer* court ordered temporary maintenance to continue after the order of dissolution and until the matter was final.

agreement, the court should not have required him to cooperate when Robin attempted to sell it. However, as we have already discussed, the separation agreement was never binding and the trial court was not required to consider its terms.

With respect to the finding that he was married to another woman in Nigeria, Jerome claims the court erred in making that finding and contends the court used this finding to "justify granting the respondent-wife a windfall by way of Orders Pendente Lite [and] to justify a disproportionate property division." However, Robin presented evidence, through letters, that Jerome was married to another woman in Nigeria. The letters, written by Jerome to people in Nigeria, specifically name his Nigerian wife and their son who both live in Nigeria. The finding was supported by the evidence.

■ Moreover, although the court made these findings, there is no evidence in the record that the court used these findings against him in any of its orders. In fact, Judge Del Muro, in her August 31, 1994, decree of dissolution, specifically found "[t]hat the parties have been equally hostile and vindictive toward each other since their separation in February, 1991." Furthermore, in addition to the "misconduct" attributed to Jerome, the court also listed misconduct on the part of Robin, specifically that she has harassed and disrupted Jerome at his place of employment and that she had been difficult and uncooperative toward Jerome throughout the separation. As a result, we find there is no evidence that the trial court used Jerome's misconduct to disproportionately or inappropriately make its division of property.

■ Jerome also asserts the trial court erred in finding the existence of assets in Nigeria because such a finding was unsupported by the evidence. To the contrary, Robin presented a letter written by Jerome to a person in Nigeria which specifically stated he had registered a business named "Ov-

erlap Enterprises" in Nigeria. He gives the registration number, the registering agent and the date of registration, February 18, 1988. Clearly, the court's finding he had a business in Nigeria was supported by the evidence. Jerome's contention that the court "theoretically" might have used this evidence to justify an inappropriate property division does not warrant a finding of error and the record contains no evidence the court's division of property was inequitable or disproportionate. The court merely stated that Jerome "has a business in Nigeria" and awarded him any interest in it. The court did not assess a value to the business and the record does not show the court gave Robin anything to offset his award of that business.

■ Jerome also contends the trial court erred in taking judicial notice of a pending appeal involving Jerome and in awarding any recovery from that case and the assets of a business, Citadel Pharmacy, to him because they had no value and caused a disproportionate disposition of property. As far as we can tell, he is referring to the following provision in the August 31, 1994, decree:

> Petitioner shall receive as his sole and separate property the securities he withdrew from the Merchants Bank certificate of deposit account as well as any equity or proceeds from the suit regarding the Citadel Pharmacy, Inc. currently pending on appeal.

Again, Jerome fails to demonstrate how this award resulted in a disproportionate award to Robin. The court does not assess a value to these items, nor does it award any property to Robin to offset this award.

■ Jerome further complains that the trial court erred in awarding a $10,000.00 certificate of deposit to him because the CD came to Jerome's business by way of a loan from his brother[9] and had been "extinguished by the bank."[10] He asserts "[s]uch awards are clearly against the weight of evidence in that they had no value, and seem to serve to justify the continuation of mainte-

---

9. At trial, Jerome said the money came from "the proceeds of the 6,000 pounds that my cousin gave me, I used $10,000 out of it to secure the line of credit for purchase of merchandise for Citadel Pharmacy."

10. Apparently, the bank took the CD when Jerome's business partner stopped making payments on the line of credit.

nance and providing a windfall to the wife." In the first place, the decree does not specifically mention the $10,000 CD, but does award to Jerome "the securities he withdrew from the Merchants Bank certificate of deposit account." We assume that is the provision to which he refers.

In any event, the record does not support the allegation that the award of the CD in any way served to justify the continuation of maintenance. As we have already said, the court's continuation of maintenance was to maintain the status quo while the case was pending and was proper. And, again, Jerome has not established that Robin received a windfall or a disproportionate or improper division of property. Moreover, Robin testified she believed that CD was marital property and testified her name was on it. The trial court determines the credibility of the witnesses. *Fox v. Fox*, 866 S.W.2d 501 (Mo. App.1993). Point denied.

 Jerome's final argument regarding the August 31, 1994, decree of dissolution is that the trial court erred in awarding sole legal custody of Mansa to Robin because the separation agreement provided for joint legal custody and "the testimony supported no less than joint legal custody." Of course, the separation agreement is irrelevant because even had it been a valid agreement, terms in a separation agreement regarding the custody, support and visitation of children are not binding on the court. § 452.325.2. Jerome is correct that in determining custody, the court is to consider the best interest of the child. § 452.375.2. The trial court found "[t]hat the parties' continued hostility toward each other prevents this court from considering joint custody in this case" and "that the minor child has throughout the separation been in the custody and control of respondent-mother" and "that petitioner-father has had visitation with the child in a somewhat regular manner." It then awarded sole legal and physical custody of Mansa to Robin and ordered reasonable visitation by Jerome. Jerome contends the trial court rested its decision to grant sole custody to Robin on the inability of the parties to agree. This is not the case. It was merely a factor the court considered. Mansa has been in Rob-

in's custody since the parties separated and the record contains evidence to support the court's award of custody to Robin rather than to Jerome. The trial court has broad discretion in its determinations regarding child custody and we will reverse only when we are firmly convinced that the welfare of the child requires some other disposition. *P.L.W. v. T.R.W.*, 890 S.W.2d 688, 690 (Mo. App.1994). We are not convinced Mansa's welfare requires us to reverse the trial court's award of sole custody to Robin. Jerome's point is denied.

Next, Jerome complains about Judge Del Muro's August 31, 1994, order determining maintenance and child support arrearages. He asserts several points of error regarding Judge Del Muro's calculations.

First, Jerome points to the August 1, 1994, order entered by Judge Del Muro in which she stated:

> A temporary order for child support and maintenance was issued on October 23, 1991. That order remained in effect until the entry of the amended decree dated June 24, 1992. The temporary order was continued from the date of the Court of Appeal's [sic] remand on April 21, 1993, and terminated as to maintenance and child support on February 28, 1994.

She then ordered the parties to submit documentation verifying payments of child support, day care, and mortgage payments made by either party from October 23, 1991, to June 24, 1992, and from April 21, 1993, to February 28, 1994.

Based on this order staying the PDL order of temporary maintenance and child support, Jerome contends he is entitled to a credit for any payments made during the nine months the first appeal was pending. He contends the court administrator's records (which were in evidence before Judge Del Muro) indicate he was charged with the PDL order for the entire period between August, 1991, and February, 1994, which would include the nine months the order was stayed pending appeal and that Judge Del Muro's order determining arrearages failed to give him credit for that period. Jerome is correct that the PDL order was stayed while the first

appeal was pending but is incorrect as to the amounts of credit to which he is entitled.

On August 31, 1994, Judge Del Muro entered her order determining maintenance and child support arrearage. In it, she found that under the October 23, 1991 PDL order, Jerome was required to pay child support through the circuit court administrator's office in the amount of $669.00 per month beginning August 1, 1991, and that he was required to pay $705.00 per month maintenance to be used to pay the mortgage payments. She specifically addressed the nine months while the first appeal was pending and found that while Jerome was not required to pay the amount ordered under the PDL order for that period, he should not receive a windfall and be free of all his obligations. She found that the parties should be equally responsible for maintaining the status quo with respect to the mortgage payments and child support while the appeal was pending. After correcting credits made by the administrator's office at Jerome's counsel's unilateral request,[11] Judge Del Muro reviewed the evidence of child support and maintenance payments made by Jerome, and calculated his arrearages. To calculate Jerome's half of the obligations (of child support and mortgage payments) during the nine months while the appeal was pending, Judge Del Muro averaged the Form 14s submitted by the parties and arrived at a total child support amount of $983.00 per month. The mortgage payments totaled $705.00 per month. Thus, for the nine months the appeal was pending, the total child support and mortgage payments due was $15,192.00. She then ordered each party accountable for one-half of that total, or $7,596.00 each. She pointed out that the administrator's office showed payments by

Jerome between August 3, 1992, and April 9, 1993, in the amount of $10,200.00 and stated Jerome did not provide any other evidence of maintenance or child support payments for that period. She then credited Jerome with the $10,200.00 he had paid through the court administrator's office, leaving him with a credit for that period of $2,604.00. She applied that credit amount against other arrearages he owed for other periods.

Jerome's argument that he should be credited for all payments he made while the appeal was pending is, in effect, an argument that he should be responsible for nothing (not even child support) during that period. The trial court's decision to equally divide the parties' obligations for that period is supported by the evidence and does not constitute an abuse of discretion.

Additionally, Jerome points out that after the final decree in February, 1994, he was no longer obligated to pay maintenance and his child support obligation was reduced to $600.00 per month. He claims the court administrator's record does not reflect that change and that the administrator should be required to adjust the record to reflect amounts due of only $600.00 per month rather than $1,374.00 per month as was required under the PDL order. He claims he was entitled to a $4,644.00 credit on his record at the court administrator's office. Again, Jerome is correct that he was only obligated to pay $600.00 after February, 1994, but is incorrect as to his claim he did not receive credits to which he claims he is entitled.

In the August 31, 1994, order, Judge Del Muro found Jerome was required to pay only $600.00 per month child support and no maintenance from February 28, 1994, (the

---

**11.** On August 5, 1994, following the entry of Judge Del Muro on August 1, 1994, order, Jerome's counsel sent a letter to the Circuit Court Administrator's Office, requesting that it give Jerome an $18,114.00 credit toward child support. In her order determining maintenance and child support arrearages, Judge Del Muro found this letter to be "rather disturbing" for several reasons, including that counsel had not sent a copy to Robin's counsel or to the court. He had also unilaterally determined the amount of credit to be given, despite the fact that the court had specifically determined there was insufficient evidence for the court to determine arrearages. Furthermore, he requested credits for ten months (rather than the nine months) for the period when the case was pending appeal and he requested credits for maintenance for that period. As Judge Del Muro pointed out, maintenance payments were not made through the court administrator's office; only child support payments were. In other words, he was asking for credits against his child support calculations for maintenance as well, which payments were never paid through that office.

date of trial) to August 1, 1994, a period of five months, for a total of $3,000.00. According to the court administrator's office records, Jerome paid $6,582.53 in child support during that period, for an overpayment of $3,582.53. She then gave him a *credit* for the $3,582.53 overpayment of child support, and applied it against arrearages from other periods. Thus, Jerome received all the credits to which he was entitled following February 28, 1994.

Jerome also contends the order determining maintenance and child support arrearages was incorrect in that Judge Del Muro denied him credits for payments he made directly to the mortgage holders as he was required to make under the PDL order. He asserts he presented evidence that he paid $7,933.69 to the holder of the first mortgage as well as other (unspecified) sums of money. Again, Jerome is correct that he was entitled to credits for payments made directly to the mortgage holders, but is incorrect on his point that he was not given the proper credits.

In her order determining maintenance and child support arrearages, Judge Del Muro found that from August 1, 1991, to July 25, 1992, Jerome owed $8,460.00 in maintenance ($705.00 per month for twelve months), and that he paid $10,032.61 in maintenance during that time frame. She arrived at the $10,032.61 figure by examining Jerome's "Request for Crediting" and supporting exhibits that he filed with the court on August 12, 1994. Jerome specifically complains that Judge Del Muro did not give him credit for $7,933.69 for payments he made to the first mortgage holder on the marital residence. This allegation is erroneous. He listed this $7,933.69 item on his request for crediting and Judge Del Muro gave him credit for it.[12]

Jerome also asserts Judge Del Muro did not give him credit toward his child support obligation for payments he made directly to Mansa's day care provider. Once again, Judge Del Muro did give Jerome credit for these payments, and he has overlooked it in her order. Judge Del Muro specifically credited Jerome $2,287.90 for payments made for day care as he listed on his request for crediting. This was in addition to credits for payments made through the court administrator's office.

Finally, Jerome implies that Judge Del Muro did not give him credit for federal tax refund intercepts, but again, this is not the case. Judge Del Muro found that the court administrator's office was holding those intercepts (they had not been paid out to Robin), and applied those funds to Jerome's arrearages. Because the tax intercepts were more than was necessary to pay his final arrearages (it left him with a $1,474.27 credit), the court administrator's office was ordered to release the tax intercepts to Robin, and Robin, in turn, was ordered to divide those moneys and pay $1,474.27 to Jerome.

In sum, the findings contained in the trial court's August 31, 1994, decree of dissolution and order determining maintenance and child support arrearages are supported by substantial competent evidence and are not against the weight of the evidence.

Finding no error, the judgment is affirmed.

All concur.

---

12. The trial court's order did not specifically list the individual items for which credit was given. However, the following items were listed on Jerome's request for credit.

1/7/92 letter and check # 630 dated 1/13/92 for $7933.69, petitioner's exhibits 75 and 15, for payment to First Mortgage, letter receipting same from Commercial Federal attorney Barnard Levin

4/13/92 receipt from Norwest Financial, petitioner's exhibit # 23, $300.00

exhibit # 61 A, record of payments to Commercial Federal Mortgage showing payments of the following amounts in 1992:

| | |
|---|---|
| 4/1/92 | $541.92 |
| 4/1/92 | 659.00 |
| 2/1/92 | 598.00 |

These figures total $10,032.61, the amount Judge Del Muro credited Jerome for that time period. Thus, it is apparent that he not only listed the $7,933.69 item on his request for credit, but the court granted him the credit.